THE STATE OF KANSAS, *ex rel. C. C. Coleman, as Attorney-general,* v. THE PULLMAN COMPANY.*

No. 14,691  (90 Pac. 319.)

SYLLABUS BY THE COURT.

1. CONSTITUTIONAL LAW—*Impairment of the Obligation of Contracts.* The Pullman Company, a corporation of the state of Illinois, contracted with the railway companies operating lines of interstate railroads in Kansas to furnish them a sufficient number of Pullman cars to meet the demands of the traveling public for that kind of service, to equip such cars for use, to provide conductors and porters for them, and to supply Pullman accommodations to railway passengers holding proper tickets, without discrimination between such passengers, reserving the right to charge and collect from passengers demanding the service compensation therefor. Subsequently the legislature enacted a law requiring foreign corporations to comply with certain conditions, including the payment of charter fees, for the privilege of transacting intrastate business, to which law the Pullman Company refuses to submit. *Held,* that a judgment ousting it from the franchise of charging and collecting compensation for Pullman accommodations furnished to passengers taken up and set down within the limits of the state does not violate the obligation of its contracts with the railway companies.

2. FOREIGN CORPORATIONS—*State Control of Domestic Business.* Other questions of law decided in this case are covered by the syllabus and opinion in the case of *The State v. Telegraph Co., ante,* p. 609.

Original proceeding in *quo warranto.* Opinion filed May 11, 1907. Judgment of ouster.

*C. C. Coleman,* attorney-general, and *F. S. Jackson,* assistant attorney-general, for The State.

*Rossington & Smith,* and *G. S. Fernald,* for defendant; *John S. Runnells,* and *Francis B. Daniels,* of counsel.

* Pending in the supreme court of the United States on a writ of error allowed June 29, 1907.

The opinion of the court was delivered by

BURCH, J.: In this case the state, on the relation of the attorney-general, seeks to oust the defendant from the corporate franchise of charging and collecting from passengers on railroad-trains compensation for the use of seats and berths in its cars between stations in Kansas. The cause is submitted upon a demurrer to the defendant's answer, including an amendment thereto. The principal questions involved are identical with those just decided in the case of *The State v. Telegraph Co., ante,* p. 609, the two cases being largely briefed together. So far as the matters determined are the same the opinion in the telegraph company case may stand as the opinion in this one.

In a separate brief filed in this case the method of computing the amount of the charter fee to be paid by the defendant is made the subject of special animadversion because the defendant's capital of $74,000,-000 is largely employed in the manufacture of cars of various kinds in the state of Illinois and in carrying on the sleeping-car business in all the other states of the Union, in Canada, and in Europe, the contention being that the law discriminates in favor of domestic corporations. The argument is even pressed to the point of questioning the good faith of the legislature—as if the court could deal with motive in the investigation of a question of power.

The size of the defendant's capital and the wide ramification of its operations have no effect upon the state's power to exclude it from intrastate business. It is simply a foreign corporation. The power to exclude includes the power to impose any conditions however onerous short of exclusion the legislature may choose, and no one can gainsay its action.

There could have been no constitutional objection to its conduct if the state had preferred domestic corporations and had allowed them to exercise corporate franchises upon the payment of charter fees com-

puted upon the amount of capital employed within the state, while foreign corporations were compelled to pay upon their whole capital, wherever used. But the state did place foreign corporations upon identically the same basis as corporations of its own creation with respect to the payment of charter fees. Both kinds, foreign and domestic, pay the same fixed percentage upon the amount of their authorized capital stock, and the supreme court of the United States has many times declared that such a method of fixing the charges for admission to the state is legal. The property of a Kansas mining company may all be located in Alaska or in South America, as the manufacturing plant of the defendant is located in Illinois and its sleeping-car business is scattered throughout the world. The mining company must pay according to the amount of its capital stock.

The fact that other states may impose like conditions, so that the defendant may be obliged to pay on forty-five times $74,000,000 to obtain permission to do local business in all the states, is irrelevant. The state of Kansas is not obliged to yield its right to impose conditions upon the local exercise of foreign corporate franchises because other states have the same right. If so, each state in the Union must make the same surrender, and the sovereign powers of a community of states may be circumvented or defied by a creature of one of them which has grown large enough to spread its business over all.

So long as a state confines its regulations of a corporation engaged in interstate commerce to domestic commerce only it does not encounter the constitutional power of congress over interstate commerce; and if each state is equally circumspect the conduct of the defendant's domestic business in all the states may be conditioned as provided in the Bush act without affecting interstate commerce in any degree.

The state of Kansas might have adopted a different rule for computing charter fees. It might have made

the amount of capital employed in the state or the amount of property located in the state the basis. The defendant might have been satisfied with one of these bases if the rate had been low enough. But the choice of bases and rates lay with the legislature, and its judgment binds. It was levying no tax. It was fixing a condition precedent, and principles governing the framing of ordinary revenue laws have no application.

The state went further in its adoption of the principles of equality and uniformity. By section 1339 of Dassler's Statutes of 1905, quoted in the opinion in *The State v. Telegraph Co., ante,* p. 609, foreign corporations admitted to do business within the state are made subject to the same provisions, judicial control, restrictions and penalties as domestic corporations— excepting only the necessary minor differences covered by the Bush act itself. Provisions of this kind are construed to exempt foreign corporations paying license fees and receiving permission to engage in business within the state from any greater duties, burdens, liabilities or restrictions than those thereafter imposed upon domestic corporations. (*American Smelting Co. v. Colorado,* 204 U. S. 103, 27 Sup. Ct. 198, 51 L. Ed. ——.) So that, having the power at the outset to prefer its own corporations by its laws, the legislature renounced that power in favor of foreign corporations which comply with the Bush act.

By the payment of its charter fee of $14,800 the defendant would, under the Bush act and the order of the charter board, receive authority to exercise its franchises within the state on the same terms and conditions as domestic corporations for twenty years. Whether these terms are oppressive or not the defendant has no right to call upon this court to decide. To determine the question it would be necessary to make an investigation of what is for the best interest of the people of Kansas, and that subject was committed to the legislature and not to this court.

The amendment to the defendant's answer states that it has contracted with the railway companies operating interstate railroads in the state of Kansas to furnish them a sufficient number of Pullman cars to meet the demands of the traveling public for that kind of service. Ownership of the cars remains in the defendant. It furnishes facilities for the accommodation of travelers and furnishes conductors and porters, but the cars themselves are used in making up passenger-trains, and are under the complete disposition and control of the railway companies, the defendant reserving the right to charge and collect from passengers holding proper railway tickets compensation for the accommodation furnished them. It is said that the railway companies as common carriers are bound by the laws of Kansas not to grant special privileges or preferences in relation to their service of the public. In supplying the needs and attending to the wants and comforts of the railway companies' passengers the defendant acts as the agent of such companies, agrees to furnish without discrimination equal facilities to all passengers who apply for them, and agrees not to withhold such privileges from any properly demeanored person provided with the requisite kind of transportation. The amendment also contains the following statement:

"That under and by the terms of their several contracts said Pullman Company cannot renounce or withdraw from the furnishing of such facilities from those desiring to employ and use the same wholly within the state of Kansas; that the above several contracts between said railroad companies and the Pullman Company were all made long prior to the enactment of the law, the provisions of which form the basis of the present action and proceeding; that such contracts are legal, valid and proper, and in harmony and compliance with the laws of the state of Kansas then existing or since enacted with respect to the duties and obligations of said Pullman Company and the several railroad companies to the public.

"And said defendant specially pleads that the relief

sought in this action, if granted and the defendant company ousted and excluded from furnishing sleeping-car facilities to the public and all the public, without discrimination and at all times, would be in violation of the constitution of the United States, in that it would impair the obligation of said existing contracts between said Pullman Company and said railroad companies; and said defendant especially invokes the protection of that provision of the federal constitution."

The amendment to the answer is defective in that its statement of facts does not go far enough to show an exoneration of the defendant from a public-welfare law, even upon the theory of the law for which it contends.

The assertion that the defendant cannot under the terms of its contracts withdraw from furnishing the required facilities to passengers traveling from point to point within the state is not an allegation of fact, but the defendant's conclusion of law respecting the binding effect of its agreements. It states what the defendant conceives to be the legal principle governing its relations with the railroad companies, and not the facts from which the deduction is made.

The pleading withholds from the court all information respecting the duration of the contracts. Unless they are for a definite period, and are not terminable at the defendant's will, the legal conclusion stated does not follow. If they are for ninety-nine years, or in perpetuity, the question would be presented if private corporations performing services to the public may secure everlasting immunity from police regulation by an agreement between themselves.

The defendant is undertaking to produce new matter which will destroy the case made by the petition. It proposes to show that an otherwise proper exercise of one of the state's most important powers should be stayed for a special and exceptional reason. Conceding that the police power of the state can be suspended by private agreement, any contract proffered

as having that effect must be construed most strongly against the corporation and in favor of the state; and when such a contract is spread upon a pleading nothing can be left to inference or taken by implication.

The court also deems the answer to be insufficient in that it proceeds upon an erroneous theory respecting the law. The obligation of a contract is its engaging quality—the attribute of binding force upon the parties to it, and in this instance neither the Bush law nor a judgment of this court enforcing it can have any impairing effect upon the obligation of the contracts between the defendant and the railroad companies which it has engaged to serve. Every right and every remedy each party had against the other when the contracts were made remains in full force and effect. Not a term or a condition is changed or dispensed with or its efficacy weakened. The railroad companies may still call upon the defendant to furnish cars and equipment and attendants for its Pullman passengers or to respond in damages. The defendant may demand that its cars be hauled by the railroad companies, and may vindicate as against such companies every right secured to it by its contracts, including the right to demand and receive from the occupants of its cars compensation for services rendered. The value of the contracts to the defendant may be greatly diminished, but the obligation of the parties to each other is not affected in the slightest degree.

"Nor does every statute which affects the value of a contract impair its obligation. It is one of the contingencies to which parties look now in making a large class of contracts, that they may be affected in many ways by state and national legislation. For such legislation demanded by the public good, however it may retroact on contracts previously made, and enhance the cost and difficulty of performance, or diminish the value of such performance to. the other party, there is no restraint in the federal constitution, so long as the obligation of performance remains in full force." (*Curtis v. Whitney*, 80 U. S. 68, 70, 20 L. Ed. 513.)

This court had occasion to interpret the Bush act with reference to its effect upon contracts in the case of *The State v. Book Co.*, 69 Kan. 1, 76 Pac. 411, 1 L. R. A., n. s., 1041. It was held that the purpose of the law was the regulation of foreign corporations by the state, and that contracts are not invalidated or the binding force of obligations impaired even although created by a foreign corporation after the Bush act took effect and before compliance with its requirements. It was said that the enforcement of the law is a matter for the state alone. Contracts made by an unlicensed corporation are not unlawful, and neither party to a contract with such a corporation on one side can secure release by pleading failure to obey the statute. Much less can it be said that the law weakens the obligatory quality of contracts made prior to 1898.

The case of *Bedford v. Eastern Building and Loan Assn.*, 181 U. S. 227, 21 Sup. Ct. 597, 45 L. Ed. 834, cited by the defendant, is in harmony with this view. A mortgagor attempted to resist the enforcement of his obligation because the mortgagee had not complied with conditions imposed, after the contract had been made, upon its right to do business in the state. The right of the state to impose the conditions was recognized, and the right of the corporation to retire from business in the state because the conditions were too onerous to be met was recognized, but the statute did not discharge the obligation of the mortgagor to pay his debt. The decision is a precedent for nothing more.

There is a closer analogy between the present case and that of *Kehrer v. Stewart*, 197 U. S. 60, 70, 25 Sup. Ct. 403, 49 L. Ed. 663. There an agent of a foreign corporation was employed at a salary of twenty-five dollars per week. A law of the state where the service was to be performed imposed upon him a license tax of $200 for conducting the business of his principal. He claimed it violated the obliga-

tion of his contract, but the court said his contract
remained entirely undisturbed.

In the case of *Chicago Life Ins. Co. v. Needles*, 113
U. S. 574, 5 Sup. Ct. 681, 28 L. Ed. 1084, a statute
was passed subsequent to the formation of an insur-
ance corporation and its compliance with the law, im-
posing new conditions upon the transaction of its
business and providing that if its financial affairs
should be discovered to be in a certain state it should
be wound up and dissolved. It was held the law did
not violate the obligation of the company's contracts
with either its creditors or its policy-holders. The
opinion reads:

"The contracts of policy-holders and creditors are
not annihilated by such a judgment as was rendered
below; for, to the extent that the company has any
property or assets, their interests can be protected,
and are protected by that judgment. The action of the
state may or may not have affected the intrinsic value
of the company's policies; that would depend some-
what on the manner in which its affairs have been
conducted, upon the amount of profits it has realized
from business, and upon its actual condition when this
suit was instituted." (Page 584.)

No element of the defendant's contracts with rail-
road companies being changed or abrogated, and no
remedy for enforcing the rights of the parties having
been obstructed, enfeebled or withdrawn, the defend-
ant is simply in the situation of having made contracts
to supply, equip and conduct its cars without guard-
ing against the contingency that a charter fee might
be exacted of it for the privilege of fulfilling them so
far as business domestic to the state of Kansas is con-
cerned.

The laws of Kansas impose no duty upon the de-
fendant to continue to furnish Pullman accommoda-
tions to passengers from point to point within the state.
It is entirely free to renounce such business, if it so
desire, rather than comply with the Bush act. If it
has deprived itself of that privilege by contract with

the railroad companies transporting its cars the result cannot be attributed to any wrongful action on the part of the state. If the defendant must now either pay its charter fee or respond in damages to the railroad companies its predicament is the result of its own voluntary conduct.

As shown by the authorities cited in *The State v. Telegraph Co., ante,* p. 609, the forbearance of the state to impose restrictions upon the conduct of the defendant's business within the state at an earlier' date did not atrophy its power. The state was not obliged to anticipate that the defendant might make contracts in domination of its authority and hasten action to prevent the corporation from emancipating itself. It was required to consult nothing but the best interests of its people, and whenever occasion arose it could draw upon its constitutionally reserved fund of power to the extent necessary to promote their welfare.

The defendant itself was charged with full knowledge of the law and of the fact that the tenure of its franchises was at the sufferance of the state, and no individual or corporation could by making a contract with the defendant secure for it a supremacy over the laws which it could not by itself attain. Every person contracting with the defendant did so charged with the knowledge that the state could and might rightfully change its policy of comity at any time. If it did so the defendant's ability to perform might be impaired or destroyed, and its obligation to perform might have to be satisfied with damages. The state having violated no contract with the defendant or the parties to which the defendant has engaged itself, and having preserved in full force the obligation of the contracting parties to each other, neither of them can complain of the enactment of the Bush law. (See *Henderson Bridge Co. v. Henderson City,* 173 U. S. 592, 619, 19 Sup. Ct. 553, 43 L. Ed. 823.)

43—75 KAN.

The defendant's case is not improved by pleading that it has undertaken to serve the railway companies' passenger according to the anti-discrimination law of Kansas. The obligation to do this is no different from the obligation to perform any other act according to a righteous standard. It will not be impaired when the obligation of other contracts would not be impaired. It will be as binding upon the defendant after a judgment of ouster as before.

It may be observed that the law pleaded was enacted at the legislative session of 1905, six years after the Bush act was passed and many more years after the defendant claims it made its contracts with the railway companies; and it may be surmised that if the state were to make an effort to apply the law to the interstate business of the defendant the claim would be made quite promptly that such business was under the exclusive control of congress. The answer, however, being insufficient for the reasons already stated, these anomalies may be overlooked.

The question whether the defendant is a common carrier is of no importance. The declaration that it is such in the act of congress of June 29, 1906, (34 U. S. Stat. at L. p. 584) fixes its status only so far as it falls under federal control. If by the laws of this state it is a common carrier it is not bound to engage in intrastate business in opposition to the Bush act. Further than this the matter need not be discussed. Neither the statute nor the relief sought in this action has any reference to the defendant's interstate business.

The demurrer to the answer as amended is sustained, except as to the part denying the operation of dining-cars. By submission of the attorney-general, dining-car service is eliminated from the case. The defendant having submitted the cause upon its answer, judgment is rendered in favor of the state for the remainder of the relief prayed for, and for costs.