No. 24,729.

THE STATE OF KANSAS, on the relation of CHARLES B. GRIFFITH, Attorney-general, *Plaintiff,* v. THE KNIGHTS OF THE KU KLUX KLAN et al., *Defendants.*

SYLLABUS BY THE COURT.

1. QUO WARRANTO—*Foreign Corporation "Doing Business" in this State Without Permission from the Kansas Charter Board so to Do.* A foreign corporation may be ousted from doing business in this state where it has not obtained permission from the charter board so to do, except where its business is protected by the interstate-commerce clause of the constitution of the United States, or is exercised in behalf of the federal government.

2. SAME—*A Foreign Corporation Performing in this State All the Functions it is Authorized to Do by Its Charter is "Doing Business" Within the Provisions of the Kansas Foreign Corporation Law.* A corporation organized under the laws of another state, not for financial profit, which in this state performs all the functions it is authorized to do by its charter under the laws of the state of its organization, is doing business in this state within the meaning of the Kansas foreign corporation laws.

3. SAME—*Certain Transactions of the Defendant Corporation Are Within the Interstate Commerce Clause of the Federal Constitution.* Selling lodge paraphernalia, insignia and supplies by a corporation of one state to lodges and persons in another state, on orders from lodge officers in the latter state, is within the protection of the interstate-commerce clause of the constitution of the United States, although the selling corporation retains title to and control of the articles sold.

Original proceeding in quo warranto. Opinion filed January 10, 1925. Judgment of ouster.

*Charles B. Griffith,* attorney-general, *John F. Rhodes,* and *John G. Egan,* assistant attorneys-general, for the plaintiff.

*John S. Dean, Harry W. Colmery,* both of Topeka, and *W. L. Wood,* of Kansas City, for the defendants.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff commenced this action to oust the defendants from doing business in this state as a foreign corporation.

The charter of The Knights of the Ku Klux Klan recites that—

"The purpose and object of said corporation is to be purely benevolent and eleemosynary, and there shall be no capital stock or profit or gain to the members thereof."

The petition of the plaintiff contains two counts, the first of which alleges that—

"The defendant, The Knights of the Ku Klux Klan, is a corporation

organized and existing under the laws of the state of Georgia, and its purported purposes, among other things, are partly benevolent and eleemosynary, and its purposes are, among other things, to organize subordinate branches of the corporation in the state of Georgia and other states of the United States and elsewhere, whenever the same shall be deemed desirable in the conduct of its business, and to confer an initiative and degree ritual, and fraternal and secret obligations, words, grips, signs and ceremonies, and to own and conduct the sale of paraphernalia, regalia, stationery and other materials needed by the subordinate branches of such organization for the conduct of their business; and to publish a fraternal magazine and such other written or printed matter as shall be needed in the conduct of the business of the order; and to buy, hold and sell real estate and personal property suitable to the purpose of the corporation, and to sell, exchange and sublease said real or personal property or any part thereof, and to mortgage or create liens thereon, and to borrow money and secure the payment thereof by mortgage or deed of trust, and to appoint trustees in connection therewith; and to execute promissory notes; and to have and to use a common seal; and to sue and be sued, to plead and be impleaded, and to do and perform all things and exercise all rights which, under the laws of Georgia, are conferred upon societies or orders of like character, and to have all the powers and privileges necessary to the extension of such corporation or to the conduct of the business and purpose of orders of like nature."

The second count alleges that in this state the defendants are engaged in propagating race and religious prejudices and animosities, and are using intimidations, threats and violence to compel others to agree with the defendants and obey their commands.

The answer denies many of the allegations of the petition, admits some of them, and sets out the purposes and objects of the organization known as The Knights of the Ku Klux Klan.

Honorable S. M. Brewster, of Topeka, was appointed commissioner to hear and record the evidence and to make findings of fact and conclusions of law. That has been done.

The findings of fact made by the commissioner include the following:

"I. The defendant, The Knights of the Ku Klux Klan, is a corporation organized and existing under the laws of the state of Georgia. It is incorporated under its charter as a patriotic, secret, social, benevolent order. Its purposes are stated to be purely benevolent and eleemosynary. The corporation has no capital stock. Its charter provides that there shall be no gain or profit to the members. Its principal place of business is Atlanta, Georgia.

"The charter gives the corporation power to issue decrees, edicts and certificates of organization to subordinate branches of the corporation in its home state and in the states of the United States and elsewhere, wherever the same shall be deemed desirable. It is given power to confer initiative degree ritualism, fraternal and secret obligations, words, grips, signs, cere-

monies; but only to white male persons of sound health, good morals and high character.

"IV. The charter provides that the corporation shall have the right to own and control the sale of all paraphernalia, regalia, stationery, jewelry, and such other material as is needed by the subordinate branches of the order for the proper conduct of their business. It also provides that the corporation shall publish a fraternal magazine and other literature needed in the conduct of the business of the order, and that the corporation shall buy, hold and sell real estate and personal property suitable to the purposes of the order; sell, exchange or lease the same; mortgage and create liens thereon; borrow money, execute promissory notes; have and use a common seal; and sue and be sued.

"V. The constitution adopted by the corporate organization declares that The Knights of the Ku Klux Klan, Incorporated, is the original klan organized in the year 1866 and active during the reconstruction period of American history, and 'by and under its corporate name is revived, remodeled and expanded into a ritualistic, fraternal and patriotic society of national scope.'

"The constitution further declares that the order takes to itself all of the prescript used as the governing law of the original klan, together with all official titles, mannerisms, usages and things therein prescribed, and these are declared to be held sacred as a precious heritage which the klan shall jealously preserve, forever maintain and valiantly protect from profanation.

"VI. The constitution states the object of the order is to unite white male persons, native born, gentile citizens of the United States of America, of good reputation and respectable vocation, exemplary habits, sound mind, under a common oath into a brotherhood to cultivate and promote patriotism toward the civil government, to practice an honorable clannishness toward each other, to practice a practical benevolence, and, among other things, to maintain white supremacy.

"XXII. The constitution of The Knights of the Ku Klux Klan provides for the payment of what is called a klectoken. This klectoken, or initiation fee, received prior to the issuance of a charter to the local klan by the Georgia corporation, is not less than ten dollars for each member admitted into a klan in process of organization, which klectoken is divided as follows: Four dollars goes to the organizer of the klan; one dollar to the Imperial Representative of the defendant corporation; and five dollars is sent direct to the defendant corporation at Atlanta, Georgia. This fee has been and is being collected by the defendant corporation in Kansas by and through its representatives from each member received into a provisional klan in the state of Kansas.

"XXXII. The constitution provides that each and every member naturalized into the order of The Knights of the Ku Klux Klan must supply himself with a robe and helmet by sending an order through his kligrapp, with the required fee for the same, to the defendant corporation at Atlanta, and the constitution further provides that this robe shall be his and his only just so long as he is a member of the order in good standing, and upon his quitting or being suspended or banished, he shall return the robe to the exalted cyclops.

The State v. Knights of the Ku Klux Klan.

"It further provided that all money such member has paid shall be forfeited by him when he quits or is expelled or suspended.

"XXXIII. Some of the paraphernalia, regalia, emblems, etc., are copyrighted and the copyright is held in the name of the defendant corporation. The title to all of the paraphernalia, regalia, etc., whether used by the local klan or not, is held in the parent corporation. In the event that a klan charter is revoked or relinquished for any cause all moneys and properties must be accounted for and returned to the defendant corporation, and this· is true of all such property and moneys in Kansas held by the various klans.

"XXXIV. Members of the various klans in Kansas have procured robes, helmets and other paraphernalia in the manner and under the terms and conditions set out in the charter and constitution of the defendant corporation, and the same are still held in Kansas as the property of the defendant corporation.

"XXXV. The orders for supplies of whatever nature from any local klan in the state of Kansas are made through the officers of the local klan to the imperial representative of the defendant corporation, which imperial representative has in a way supervision over all the klans in Kansas. The orders are made out directly to the headquarters at Atlanta, and are sent, together with remittance, to the imperial representative (who for the state of Kansas is George T. McCarron, of Kansas City, Missouri). The imperial representative in turn forwards them to the home office of the corporation at Atlanta, Georgia.

"XXXVI. Under the constitution it is obligatory for all of the copyrighted supplies to be obtained by the local organizations from Atlanta, Georgia. This applies to robes, stationery and ritualistic matters—all of which are manufactured or procured by the defendant corporation, The Knights of the Ku Klux Klan. Every order must go to the superior officers from the inferior officers, through the proper channels, until it officially reaches the imperial officers, and must come back the same way, through the imperial officers on down to the local officers. The corporation controls the handling and the use of all robes, insignia and paraphernalia of every kind as herein described. It is exercising and has exercised such control over such property in the state of Kansas.

"XXXVII. If official documents are wanted, an order is sent to the imperial representative at Kansas City by the exalted cyclops of the particular lodge. The imperial representative in turn sends the order to the imperial kligrapp (national secretary), who fills the order and sends it to the imperial representative at Kansas City, Missouri, who in turn transmits it to the exalted cyclops of the particular klan in Kansas, who holds custody of it for the defendant corporation under the rules prescribed by the constitution of the defendant organization.

"XXXVIII. In receiving orders for robes, etc., and in collecting money for the same and in transmitting the money and order to Atlanta, Georgia, the klaliff or secretary of the different lodges in Kansas acts for and is the representative of the defendant corporation, and on the arrival of the supplies ordered from the defendant corporation, the officer having charge and custody of the same in the various lodges in Kansas holds the same as a

representative of the defendant corporation, which corporation owns and has control·thereof as heretofore found.

"XXXIX. The defendant corporation owns and controls in the state of Kansas all the paraphernalia, regalia, etc., used in the state by the various klans or subordinate lodges or the individual members thereof.

"XL. The defendant corporation owns considerable personal property within the state of Kansas in the way of robes, insignia, etc., the exact amount or value of which the evidence does not disclose, and is exercising the right and power to hold such property in the state of Kansas.

"XLI. The defendant corporation sells supplies and has sold supplies to the various klans in the state of Kansas—jewelry, stationery, insignia and paraphernalia of all kinds—all of which have been sold and handled through the local officers of each klan in the manner described in findings Nos. XXXV, XXXVI, and XXXVII.

"XLII. The Knights of the Ku Klux Klan, Incorporated, has not made any application to the state charter board of the state of Kansas for authority to engage in business in the state of Kansas as a foreign corporation, nor has it, or anyone for it, complied with the laws of the state of Kansas respecting the doing of business therein by a foreign corporation.

"XLV. Each and all of the primary powers and purposes and businesses which the defendant corporation is authorized and empowered to do, and for which it is incorporated, are done, exercised and carried on in the state of Kansas by such defendant corporation through the various local klan organizations, and through its various agents and representatives, and under the control and direction of the imperial officers of the defendant corporation.

"XLVIII. Considerable evidence was introduced before the commissioner, both oral and documentary, as to threats made against individuals, and as to practices of intimidation and threats of injuries to persons and property, but your commissioner finds that such testimony is wholly insufficient to connect the defendant corporation with any of such alleged acts and practices, and finds that there is no evidence that the defendant corporation or the individual defendants have ever engaged in or authorized such practices in Kansas. There is nothing to connect the defendant corporation or the individual defendants with any of the threatening letters introduced in evidence and marked, respectively, 'Plaintiff's Exhibits Nos. 24, 25, 26, 27, and 28'."

Other findings of the commissioner gave in detail the manner in which the defendant corporation operates in this state.

Among the conclusions of law found by the commissioner are the following:

"I. The defendant corporation, The Knights of the Ku Klux Klan, is a foreign corporation governed by the provisions of section 17-505, Revised Statutes of Kansas for 1923.

"II. The defendant corporation is doing business in the state of Kansas within the meaning of section 17-505 and section 17-506, Revised Statutes of Kansas for 1923.

"III. The defendant corporation is doing business in the state of Kansas

without authority of law and in violation of the statutes of the state of Kansas."

Exceptions have been filed by the state to those findings of the commissioner which concern the failure of the evidence of the plaintiff to establish the allegations of the petition that the defendants are propagating race and religious prejudices and hatreds, and are using intimidations, threats and violence to compel others to agree with the defendants and obey their commands. The defendants have filed no exceptions to the report of the commissioner, but argue that his conclusions of law are not correct.

After an examination of the evidence as set out in the abstract of the plaintiff, the court approves the findings of fact made by the commissioner, adopts them and makes them the findings of the court.

1. The state challenges the right of The Knights of the Ku Klux Klan, a foreign corporation, to do business in this state without first securing authority from the charter board.

The pertinent statutes are parts of sections 17-501 and 17-503 of the Revised Statutes, which read:

"Any corporation organized under the laws of any other state, territory or foreign country, and seeking to do business in this state, shall make application to the state charter board, upon blank forms supplied by the secretary of state, for authority to engage in business in this state as a foreign corporation. . . ."

"The state charter board, in passing upon the application of a foreign corporation, shall make special inquiry with reference to the solvency of such corporation, and for this purpose may require such information and evidence as they may deem proper. If they shall determine that the corporation is organized in accordance with the laws of the state, territory or foreign country under which it is incorporated, that its capital is unimpaired, and that it is organized for a purpose for which a domestic corporation may be formed, the application shall be granted. . . ."

The definition of a corporation given in 14 C. J. 49 is as follows:

"A corporation is a collection of natural persons, joined together by their voluntary action or by legal compulsion, by or under the authority of an act of the legislature, consisting either of a special charter or of a general permissive statute, to accomplish some purpose, pecuniary, ideal or governmental, authorized by the charter or governing statute, under a scheme of organization, and by methods thereby prescribed or permitted; with the faculty of having a continuous succession during the period prescribed by the legislature for its existence, of having a corporate name by which it may make and take contracts, and sue and be sued, and with the faculty of acting as a unit in respect of all matters within the scope of the purposes for which it is created."

We quote from 14A C. J. 1215 as follows:

"A foreign corporation can have no legal existence beyond the bounds of the state or sovereignty by which it is created. It exists only in contemplation of law and by force of the law, and where that law ceases to operate the corporation can have no existence. It must dwell in the place of its creation and cannot migrate to another sovereignty. This principle does not prevent a corporation from acting in another state or country with the latter's express or implied consent. But every power which a corporation exercises as such in another state depends for its validity upon the laws of the sovereignty in which it is exercised. A state cannot impose one of its artificial creatures on another sovereignty nor confer upon its corporators powers which they can lawfully exercise beyond its jurisdiction. A corporation can exercise none of the functions and privileges conferred by its charter in any other state or country except by the comity and consent of such state or country."

To the same effect is *Land Grant Railway v. Com'rs of Coffey County,* 6 Kan. 245, where this court said:

"A corporation is an artificial being, and can have no legal existence out of the boundaries of the sovereignty by which it is created. It must dwell in the place of its creation, and cannot migrate to another sovereignty."

In *Foster v. Caskey,* 66 Kan. 600, 72 Pac. 268, is found a quotation from *St. Louis v. The Ferry Company,* 11 Wall. 423, 429, as follows:

"In the jurisprudence of the United States a corporation is regarded as in effect a citizen of the state which created it. It has no faculty to emigrate. It can exercise its franchises extraterritorially only so far as may be permitted by the policy or comity of other sovereignties."

In *Foster v. Caskey,* supra, on page 602, the language quoted from *Land Grant Railway v. Com'rs of Coffey County,* supra, is repeated. In *Williams v. Railway Co.,* 68 Kan. 17, 21, 74 Pac. 600, similar language is quoted from *Bank of Augusta v. Earle,* 13 Pet. 519, 588.

Prior to the enactment of our statutes governing the manner in which foreign corporations may be admitted to do business in this state they did business under what is known as comity between the states. On the subject of comity, 14A C. J. 1217 says:

"Under principles of comity, and except as otherwise provided by constitutional or statutory provisions, a corporation created by any state or nation is permitted to enter other states, and there to exercise all legitimate powers conferred upon it and to carry on as a corporation any business not prohibited by the local laws or against the local public policy. The rules of comity are subject to local modification by the lawmaking power. But until so modified they have the controlling force of legal obligation, and it is the duty of the courts to observe and enforce them until the sovereign otherwise directs. The comity involved is the comity of the state, not of the courts, and the judiciary must be guided by the principles and policy adopted by the legislature. No restric-

The State v. Knights of the Ku Klux Klan.

tions can be imposed by the courts without the sanction of the lawmaking power. This comity must be presumed to exist, and does exist, until a state expresses an intention to the contrary in some affirmative way; that is, by direct enactments on the subject, or by its public policy deduced from the general course of legislation or the settled adjudications of its courts of last resort. Legislative silence upon the subject is equivalent to permission. Statutes authorizing foreign corporations to do business within the state and prescribing the terms and conditions upon which they shall be permitted to do so have been almost universally adopted, and their construction and application forms a large part of the law of foreign corporations. Upon compliance with such statutes the foreign corporation may transact business with [within] the state as if under a franchise from the state, and ordinarily in the same manner as if it were a domestic corporation."

The legislature may prescribe the terms and conditions upon which foreign corporations may be permitted to do business in this state. The United States supreme court in *Interstate Amusement Co. v. Albert*, 239 U. S. 560, 568, said:

"For the authority of the state to restrict the right of a foreign corporation to engage in business within its limits or to sue in its courts, so long as interstate commerce be not thereby burdened, is perfectly well settled. (*Paul v. Virginia*, 8 Wall. 168, 181; *Hooper v. California*, 155 U. S. 648, 655; *Bank of Augusta v. Earle*, 13 Pet. 519, 589, 591; *Anglo-American Prov. Co. v. Davis Prov. Co.*, 191 U. S. 373; *Sioux Remedy Co. v. Cope*, 235 U. S. 197, 203.)"

In *The State v. Telegraph Co.*, 75 Kan. 609, 631, 90 Pac. 299, this court used the following language:

"The right of the state altogether to exclude foreign corporations from the exercise of corporate franchises within its borders, or to admit them upon such conditions as it may see fit to impose, has been vindicated so often that a brief reference to a limited number of the decided cases will suffice."

Quotations are then given from a number of decisions of the supreme court of the United States sustaining the proposition of law declared by this court. The decision in *The State v. Telegraph Co.* was reversed by the supreme court of the United States, but not because of the declaration of law just quoted.

The same rule was declared by this court in *The State v. Pullman*, 75 Kan. 664, 90 Pac. 319, which was also reversed by the United States supreme court, but that court in reversing *The State v. Telegraph Co.* and *The State v. Pullman* recognized the authority of the states to prescribe the terms and conditions on which foreign corporations may be permitted to do business in the state so long as those terms and conditions do not in any way interfere with provisions of the constitution of the United States.

In discussing the rights of a foreign corporation to do business in another state, the law makes no distinction between the different classes of corporations, whether aggregate, civil, ecclesiastic, eleemosynary, lay, municipal, private, public, or sole. When organized under the laws of another state each of these different classes of corporations is a foreign corporation. This rule follows from the principle that the laws of one state can have no extraterritorial force. Subject to minor qualifications, not here necessary to note, the laws of a state cease when the state line is reached.

Since the legislature has prescribed the terms on which a foreign corporation may be permitted to do business in this state, such corporations must conform to those terms unless protected by provisions of the constitution of the United States; otherwise they may be ousted from doing business in this state.

2. The defendants contend that the corporation is not doing business in this state within the meaning of our foreign corporation laws. The commissioner found as a conclusion of law that the defendant corporation is doing business in the state of Kansas within the meaning of those laws. In his findings the commissioner sets out in detail the operations of The Knights of the Ku Klux Klan in this state. Those operations show that the corporation is functioning here under its charter.

Section 17-506 of the Revised Statutes should be noticed. It reads:

"Every corporation organized under the laws of another state, territory or foreign country that has an office or place of business within this state, or a distributing point herein, or that delivers its wares or products to resident agents for sale, delivery or distribution, shall be held to be doing business in this state within the meaning of this act." .

The defendants argue that to do business, that must be done which is for pecuniary profit, and that our foreign corporation laws apply only to corporations engaged in some kind of commercial, financial or business enterprise, and not to corporations organized for religious, charitable or benevolent purposes.

Our statutes permitting foreign corporations to operate and to do business in this state limit the power of foreign corporations to do business to those fields for which a domestic corporation may be formed. (R. S. 17-503.) Domestic corporations may be created for the support of public worship and for the support of any benevolent, charitable, educational or missionary enterprise. (R. S. 17-202.) The business of a corporation organized for the support

of public worship or for the support of benevolent, charitable, educational or missionary undertakings is to support public worship and to support benevolent, charitable, educational or missionary undertakings., A foreign corporation, when it comes into this state for the purpose of supporting public worship or of supporting a benevolent, charitable, educational or missionary undertaking, does the business for which a domestic corporation can be organized. One purpose of our statute is to permit foreign corporations to do the same business in this state that a domestic corporation can do, and another purpose is to require the foreign corporation to obtain permission to do the business that a domestic corporation can do.

We look to law books for assistance in the solution of this question. 14A C. J. 1270 says:

"The general rule is that when a foreign corporation transacts some substantial part of its ordinary business in a state, it is doing, transacting, carrying on or engaging in business therein, within the meaning of the statutes under consideration."

A very large number of cases are cited to support the statement just quoted.

Throughout our corporation statutes a distinction is made between corporations for profit and those not for profit. Other than that distinction there is nothing in our corporation law to assist in the interpretation of sections 17-501, 17-503 and 17-506 of the Revised Statutes.

So far as we have been able to ascertain, the courts and law writers, in discussing the rights of private corporations to do business in states other than those in which they are organized, make no distinction between corporations organized for profit and those organized not for profit. The language used is always broad enough to include both kinds of corporations, although used to describe private corporations organized for profit.

In prescribing the manner in which foreign corporations may be admitted to do business in this state the law makes no direct distinction between corporations for profit and those not for profit. The language used by the legislature is broad enough to include both of them, although there is that in the statute which may lead one to the conclusion that the law is intended to be applied to corporations organized for profit only.

There are some declarations of other courts along the line indicated in 14A C. J. 1270 that will be of assistance in reaching a correct conclusion.

The supreme court of Alabama, in *Beard v. The Union & American Publishing Company*, 71 Ala. 60, 62, said:

"Receiving subscriptions to a newspaper or collecting the money therefor, although the paper is published in another state, and by a corporation, is not doing 'business' in this state within that section of the constitution. There must be a doing of some of the works or an exercise of some of the functions for which the corporation was created to bring the case within that clause."

In *The People v. C., I. & L. Ry. Co.*, 223 Ill. 581, 588, the court said:

"The expression 'doing business in this state' . . . has been defined to mean doing the business or character of business for which the corporation was organized."

In *Kline Bros. & Co. v. German Union Fire Ins. Co.*, 132 N. Y. Supp. 181, 185, the following language is found:

"Doing business within the meaning of section 15 of the general corporation law relates to the ordinary business which the corporation was organized to do, and has no relation to the incidental contract of a foreign corporation with a domestic corporation, such as the insuring of its property."

The supreme court of Texas, in *Smythe Co. v. Ft. Worth Glass & Sand Co. et al.*, 105 Texas 8, 15, quoted from *Beard v. Union & American Publishing Co.*, 71 Ala. 62, as follows:

" 'There must be a doing of some of the work or an exercise of some of the functions for which the corporation was created to bring the case within that clause.' "

In *Barse Live Stock Co. v. Range V. C. Co.*, 16 Utah 59, 65, the court said:

"The constitution applies to all corporations. In our opinion, the constitution, when reasonably construed, was intended to prohibit corporations from transacting their ordinary corporate business within the state without first complying with its terms, and having one or more places of business, with an authorized resident agent upon whom process could be served in cases of litigation between them and citizens of the state."

This language was used pertaining to the following provision of the constitution of that state:

"No corporation shall do business in this state without having one or more places of business, with an authorized agent or agents upon whom process may be served, nor without first filing a certified copy of its articles of incorporation with the secretary of state." (p. 64.)

A similar statement is found in *Rich v. Chicago, B. & Q. R. Co.*, 34 Wash. 14, 17, as follows:

The State v. Knights of the Ku Klux Klan.

"It is not easy to formulate a general rule by which it can be determined in all cases whether or not a corporation is doing business at a particular place; but it seems to be the consensus of opinion that a corporation, to be within the rule, must transact within the state some substantial part of its ordinary business, continuous in the sense that it is distinguished from merely casual or occasional transactions, and it must be of such a character as will give rise to some form of legal obligation."

All these cases concerned corporations for profit. In *Conference Free Baptists v. Berkey,* 156 Cal. 466, 469, this language was used concerning a corporation organized under the laws of Maine for "religious, missionary, educational and charitable" purposes:

"There are decisions, however, which hold that a foreign corporation may come within the purview of such statutes by the doing of a single act. But even in the states which announce this doctrine it is held that the single act which will bring the corporation within the purview of the statute must be an act of the ordinary business of the corporation. In the language of the supreme court of Alabama, 'There must be a doing of some of the works or an exercise of some of the functions for which the corporation was created to bring the case within that clause.'"

In *Wilson v. Bank,* 77 Kan. 589, 595, 95 Pac. 404, this court said:

"The very terms of the statute discriminate between maintaining actions and doing business, and the only rational meaning of 'doing business' is the carrying on of the operations of the corporation, or some portion of them, in the usual and regular course of the prosecution of the corporate enterprise for profit."

But in *Lumber Co. v. State Charter Board,* 107 Kan. 153, 162, 190 Pac. 601, this court used the following language:

"The general holding of the courts is that the doing of business is the exercise of some of the functions and the carrying on of the ordinary business for which the company is organized."

The expression that the business "must be of such a character as will give rise to some form of legal obligation," found in *Rich v. Chicago, B. & Q. R. Co.,* supra, would indicate that the foreign corporation laws of Washington do not apply to corporations not for profit. The case was one for personal injury, for the negligence of the railroad. The expression probably was not used for the purpose of drawing a distinction between corporations for profit and those not for profit. With that qualification, the language used is in harmony with that used by the other courts and with the language used in 14A C. J. 1270.

We quote from *Knights of the Ku Klux Klan v. Commonwealth* (Va.), 122 S. E. 122, as follows:

"Whether or not The Knights of the Ku Klux Klan, a corporation chartered under the laws of the state of Georgia, is required to comply with the statutes applicable to foreign corporations desiring to do business or exercise their corporate functions in this state is the question here involved. . . .

"It seems to us that the mere recital of the fact that the appellant is a Georgia corporation is sufficient to sustain the conclusion of the commission, for the language of the inhibiting statutes seems too plain to require any interpretation. The constitution precludes foreign corporations from exercising their functions in this state, except upon compliance with the laws of the state, and expressly authorizes the general assembly to discriminate against foreign corporations if it is deemed expedient. That the general assembly may exclude foreign corporations from exercising their corporate functions within this state, subject only to the inhibitions of the federal constitution, is everywhere conceded. It is claimed here, however, by the appellant, that the state has neither exercised this undoubted power nor imposed any conditions or restrictions upon corporations of this class, and the supporting argument is chiefly based upon the contention that the words 'doing business' cannot be applied to a corporation which claims to be organized for patriotic and benevolent purposes." (p. 123.)

Then follows a description of the manner in which The Knights of the Ku Klux Klan operate and the purposes for which they operate, the same as is shown in the findings of the commissioner in the present action. Then this language follows:

"From these conceded facts it is perfectly apparent that the corporation is exercising its functions and powers within this state. The claim is, however, that the words 'doing business' have reference to the exercise of some commercial, manufacturing or other function, and that the state has only intended to exclude corporations of this character. We find nothing in the Virginia statutes to justify such a limitation upon the language used." (p. 124.)

Another case which is illuminating is *Pacific Typesetting Co. v. I. T. U.,* 125 Wash. 273, 216 Pac. 360. In the opinion in that case the court used the following language:

"It becomes necessary to determine whether this association, the International Typographical Union, was doing business within this state. It can hardly be argued that it was not, for among the important activities of an association such as this is the securing of what its members deem proper hours of labor for them in their trade, and the adoption of satisfactory working conditions and pay. These constitute the major purposes and the principal activities of such organizations. They are created primarily to attain these results, and the effort in any community to secure from their employers the adoption of any or all of these beneficient standards of employment is engaging in the very business for which they continue their existence. Therefore, when the International Typographical Union authorized Howard to employ all lawful means to secure the adoption of the 44-hour week in the printing trade in Seattle, it authorized him to carry on the business of the association to that important extent." (p. 277.)

The defendant corporation is doing business in this state within the meaning of our foreign corporation laws.

3. The defendants contend that all the transactions of The Knights of the Ku Klux Klan with citizens of the state of Kansas are interstate commerce and therefore free from state regulation.

The report of the commissioner shows that the defendant corporation is selling lodge insignia, paraphernalia and supplies in the state of Kansas. These things are manufactured in Georgia and are sold, or perhaps delivered only, to the officers of subordinate organizations in the state of Kansas on the order of those officers transmitted to the headquarters or home office of the defendant corporation at Atlanta, Ga., and the paraphernalia, insignia and supplies are sent from Atlanta, in obedience to the orders received from the officers of the subordinate organizations in the state of Kansas. So far as this proposition is concerned it is controlled by *International Textbook Co. v. Pigg*, 217 U. S. 91, which reversed *Textbook Co. v. Pigg*, 76 Kan. 328, 91 Pac. 74. There this court held that the International Textbook Company, a Pennsylvania corporation, conducting a correspondence school which employed agents in Kansas to solicit students and transmit to the central office in Pennsylvania the fees paid by students, could not maintain an action to recover on a contract signed by one of its students because the corporation had failed to comply with the foreign corporation laws of this state. The United States supreme court said that the corporation was engaged in commerce among the states. That court used the following language:

"It is true that the business in which the International Textbook Company is engaged is of a somewhat exceptional character, but, in our judgment, it was, in its essential characteristics, commerce among the states within the meaning of the constitution of the United States. It involved, as already suggested, regular and practically continuous intercourse between the Textbook Company, located in Pennsylvania, and its scholars and agents in Kansas and other states. That intercourse was conducted by means of correspondence through the mails with such agents and scholars. While this mode of imparting and acquiring an education may not be such as is commonly adopted in this country, it is a lawful mode to accomplish the valuable purpose the parties have in view. More than that, this mode—looking at the contracts between the Textbook Company and its scholars—involved the transportation from the state where the school is located to the state in which the scholar resides, of books, apparatus and papers useful or necessary in the particular course of study the scholar is pursuing, and in respect of which he is entitled from time to time, by virtue of his contract, to information and direction. Intercourse of that kind

37—117 KAN.

between parties in different states, particularly when it is in execution of a valid contract between them, is as much intercourse in the constitutional sense as intercourse by means of the telegraph." (p. 106.)

Many decisions might be cited to show that the sale of lodge paraphernalia, insignia and supplies by the defendant corporation to its subordinate organizations in the state of Kansas is interstate commerce, but it is not deemed necessary to cite any of them. For the purposes of this case it will be conceded that those transactions are interstate commerce and are beyond the control of this state because they are under the protection of the interstate-commerce clause of the constitution of the United States.

The findings show that the defendant corporation owns and controls all the paraphernalia, insignia, etc., used in this state by the local organizations or the individual members thereof, but that does not destroy the interstate-commerce character of the transaction by which those paraphernalia and insignia get into the hands of the local organizations or of their members.

While the sale of lodge paraphernalia, insignia and supplies by the defendant corporation to subordinate lodges in this state is interstate commerce, the ownership of that paraphernalia, insignia and supplies after they arrive in this state is not interstate commerce, neither is the organization nor control of lodges of The Knights of the Ku Klux Klan within this state interstate commerce.

The defendant corporation, The Knights of the Ku Klux Klan, is ousted from organizing or controlling lodges of The Knights of the Ku Klux Klan in this state and from exercising any of its corporate functions in the state of Kansas except such as are protected by the interstate-commerce clause of the constitution of the United States.

HOPKINS, J., not sitting.

BURCH, J. (concurring specially): This case presents an interesting question of corporation law. The question is whether the phrase "seeking to do business" and other expressions relating to engaging in business, found in the statute relating to exercise of corporate privilege in this state by foreign corporations, are limited in their application to business in the trade sense of producing, buying, selling, financing and similar activities for pecuniary profit, or extend broadly to exercise of any corporate function in the achievement of any corporate purpose. To illustrate: From 1893 until 1905 the Red Cross was a corporation of the District of

Columbia, and hence a foreign corporation in its relation to this state. In 1905 it was reorganized and reincorporated by congress, acting under its constitutional power. The foreign-corporation statute of this state was passed two years later. If the Red Cross had remained a foreign corporation it could not, after passage of the statute, have entered this state to mitigate the suffering caused by pestilence, famine, fire, flood and other calamities without permission of the charter board, if that work constitutes doing business. The decision of the court is that activity displayed in carrying out corporate purpose is doing business within the meaning of the statute, and under the circumstances stated the Red Cross would have been under necessity, if it desired to avoid liability to ouster, to get a permit to do the work described. Lists have been furnished to the court of incorporated societies, associations and bodies organized for purposes remote from conduct of business for pecuniary profit, which it is said will be subject to ouster under the interpretation of the statute which the court adopts. This being true, the fact brings into relief the necessity always resting upon the court of rendering decisions which will stand up after the circumstances under which the particular cases originated have been forgotten.

In the case of *Topeka v. Jones,* 74 Kan. 164, 86 Pac. 162, the court adverted to the different meanings conveyed by the word "business," and noted that Webster's International Dictionary gives seven definitions. The Oxford English Dictionary gives twenty-four uses. Replying to the inquiry of his amazed and sorrowing parents, who had been seeking him, Jesus said, "Wist ye not that I must be about my Father's business?" Between that business and the business of certain money changers subsequently conducted in the temple there is a wide difference; and something of that difference is reflected in the classification of corporations in the statute of this state:

"Corporations are either: *First,* public; or, *second,* private.

"A public corporation is one that has for its object the government of a portion of the state.

"Private corporations are of three kinds: *First,* corporations for religion; *second,* corporations for charity or benevolence; and *third,* corporations for profit." (R. S. 17-101, 17-102, 17-103.)

In stating the purposes for which private corporations may be formed, the distinction between, let us say, things spiritual and things material is maintained, and the nonprofit purposes come first.

"The purposes for which private corporations may be formed are: (1) The support of public worship. (2) The support of any benevolent, charitable, educational or missionary undertaking. (3) The support of any literary or scientific undertaking, the maintenance of a libary, or the promoting of painting, music, or other fine arts." (R. S. 17-202.)

Special provision is made for organization of various kinds of corporations of the nonprofit class:

"Any religious society, military or fire company, literary, charitable or benevolent association, other than colleges, universities, academies or seminaries, or any grand or subordinate lodge of Free and Accepted Masons, or of the Independent Order of Odd Fellows, Knights of Pythias, Knights of Honor, Ancient Order of United Workmen, Independent Order of Mutual Aid, Good Templars, or any other secret benevolent association or organization, may by the consent of a majority of its members become bodies corporate under this act, by filing the charter required by this act, electing directors or trustees, and performing the things as are directed in the case of other corporations. . . .

"No religious, literary, scientific, industrial, benevolent or other society, association, company, corporation or institution that does not have a capital stock will be required, in its charter, to make any statement of the amount of capital stock or amount of each share; but such charter, if it contains the other statements therein required, and also an estimate of the value of the goods, chattels, lands, rights and credits owned by the corporation, will be sufficient." (R. S. 17-1701, 17-1702.)

We do not often speak of the promotion of religion or philanthropy or the liberal arts as business. We reserve the word for enterprises that deal with dollars. Sometimes the reservation is made with a circumspection which seems rather refined. Thus, the supreme court of Illinois held the Chicago Board of Trade was not organized for the transaction of business, and put the corporation in a class with those formed to inculcate morality. In the case of *The People, ex rel., v. Board of Trade*, 80 Ill. 134, expulsion of a member was involved. The court said:

"It is true that the body is organized under a statutory charter, and so are churches, Masonic bodies, and Odd Fellow and temperance lodges; . . . being organized by voluntary association, and not for the transaction of business, but for the purpose of inculcating their precepts and trusts, not for pecuniary gain, but for the advancement of morals and for the improvement of their members, they are left to adopt their constitutions, by-laws and regulations for admitting, suspending or expelling their members.

"This organization is not maintained for the transaction of business or for pecuniary gain, but simply to promulgate and enforce amongst its members correct and high moral principles in the transaction of business. It is not engaged in business, but only prescribes rules for the transaction of business." (p. 136.)

On the other hand, there are associations organized, not for profit in the dividend sense, but for economic advantage to members, which makes them properly classifiable as corporations for profit; and, speaking generally, the private corporation has become such a potent and omnipresent factor in our economic affairs that when the doing of business by a corporation is mentioned, habit of thought gives rise to the idea of business for material gain.

In final analysis the basis of the court's decision reduces to this: Because usage of the language permits us to refer to the work of a missionary exercising the functions of a corporation for promotion of religion as business; because it is permissible to speak of the business of benevolence, the word "business" as used in the statute may be dissociated entirely from the thought of material profit or advantage. No text cited in the opinion of the court was written with this specific subject in mind, and but two of the decisions quoted touch this specific subject—*Pacific Typesetting Co. v. I. T. U.*, 125 Wash. 273, and *Knights of Ku Klux Klan v. Commonwealth* (Va.), 122 S. E. 122. In the Washington case a labor union organized to improve the lot of workingmen with respect to hours, working conditions and wages was seeking to accomplish its purposes. The court simply made the pronouncement that the union was doing the business for which it was organized. In the Virginia case the court said it found nothing in the Virginia statutes justifying restriction of the phrase "doing business" to exercise of some commercial or manufacturing function. The court did not undertake to demonstrate from the statutes that the legislature of Virginia intended the phrase to embrace exercise of corporate function generally. The court did buttress its decision by authority. Out of the compendious literature of corporation law, one case was cited—the Washington case—and so the court said, "There is nothing unusual about this conclusion." That being true, this court, with two cases before it, would be justified in referring to the unbroken line of judicial decisions.

Now the question is not whether it is permissible to interpret the statute in a certain way; the question is, What did the legislature mean? It is not easy to return an answer with a feeling of confidence in its correctness; but consideration of the history of the legislation inclines me to the opinion the legislature did not choose its phrases with nice discrimination of meaning, and that "seeking to do business in this state" probably meant no more than seeking admission to the state.

At the special session of the legislature in 1898 the law relating to private corporations was revised. A charter board was created to pass on applications to form domestic corporations, and to pass on applications of foreign corporations to do business in this state. Section 2 of the act reads as follows:

"Sec. 2. Persons seeking to form a private corporation under any of the laws of this state, or any corporation organized under the laws of any other state, territory or foreign country, and seeking to do business in this state, shall make application to said board, upon blanks supplied by the secretary of state, for permission to organize a corporation, or to engage in business as a foreign corporation in this state. Such application shall set forth—

"If a corporation to be organized under the laws of this state: 1st, The name desired for such corporation. 2d, The place where its principal office or place of business is to be located. 3d, The length of time for which said corporation is to exist. 4th, The full nature and character of the business in which it proposes to engage. 5th, The names and addresses of the proposed incorporators. 6th, The proposed amount of the capital stock.

"If a corporation organized under the laws of another state, territory or foreign country and seeking to do business in this state: 1st, A certified copy of its charter or articles of incorporation. 2d, The place where its principal office or place of business is to be located. 3d, The full nature and character of the business in which it proposes to engage. 4th, The names and addresses of the officers, trustees or directors and stockholders of the corporation. 5th, A detailed statement of the assets and liabilities of said corporation, and such other information as the board may require in order to determine the solvency of the corporation. Such statement shall be subscribed and sworn to by the president and secretary or by the managing officer of said corporation." (Laws 1898, Sp. Sess., ch. 10.)

The expression "persons seeking to form a private corporation" under any of the laws of this state includes persons seeking to form a private corporation not for profit, as well as persons seeking to form a private corporation for profit. The corresponding expression relating to foreign corporations begins with words equally general: "any corporation organized under the laws of any other state," etc. The expression "seeking to do business in this state" is the correlative of "seeking to form" a domestic corporation, and it is difficult to attribute to the legislature an intention then and there to make a classification of corporations and to limit the phraseology to corporations for profit only.

The application to form a domestic corporation must state the full nature and character of the business in which the corporation proposes to engage. The requirement necessarily applies to corporations not for profit, and nature and character of business mean

nature and character of the proposed undertaking. The same requirement is made respecting a foreign corporation, and of course to the same end; that is, to inform the charter board of the full nature and character of the proposed undertaking.

The statute embraced many subjects, and seemingly because its various requirements—except some expressly limited to corporations for profit—would otherwise extend to corporations foreign and domestic, for profit and not for profit, without distinction, the act concluded with the following section:

"Sec. 16. Nothing in this act shall be construed to apply to religious, educational, charitable, fraternal, benevolent or beneficiary societies, or other associations or lodges, not organized for pecuniary profit, except that they may incorporate under the provisions of this act by submitting their application to the charter board and paying the fee for filing and recording." (Laws 1898, Sp. Sess., ch. 10.)

This section opened the state to foreign corporations of the character indicated without preliminary application and without restriction of any kind.

The various sections of the act of 1898 were given paragraph numbers in the General Statutes of 1901, and section 16 of the act of 1898 became paragraph 1268. In 1907 the corporation law was again revised. (Laws 1907, ch. 140.) Section 16 of chapter 10 of the law of 1898, as paragraph 1268 of the General Statutes of 1901, was repealed. The section was expressly mentioned for repeal in the title of the act, but the act itself contained no repealing clause. The act, however, was revisory, and the only portion of the exemption made by original section 16 which was saved was that relating to payment of an application fee. The act of 1898 contained the following provision:

"Each application for permission to organize a corporation, or to engage in business in this state as a foreign corporation, shall be accompanied by a fee of twenty-five dollars, to be known as an application fee. . . ." (Laws 1898, Sp. Sess., ch. 10, § 3.)

Corporations not for profit, whether foreign or domestic, were exempted from payment of this fee by section 16. Section 21 of the act of 1907 reads as follows:

"Each application to the charter board for permission to organize a domestic corporation or to engage in business in this state as a foreign corporation shall be accompanied by a fee of twenty-five dollars, to be known as an application fee: Provided, That corporations organized for religious, educational or charitable purposes, having no capital stock, shall not be required to pay such fee." (Laws 1907, ch. 140.)

As indicated above, the exemption here provided for is all that remains of section 16 of the act of 1898. The next section (section 22) of the act of 1907 provides for a filing and recording fee, but grants no exemption.

The result is, the legislature fully considered the general exemption from the act of 1898 of corporations not for profit, preserved the exemption with respect to the one subject only, and refused to extend it to any other provision of the act. There was good reason for this legislation. The period was one in which states were spawning corporations with amazing fecundity. Corporate morals were not always the best. This state ought to know what corporations, no matter for what purposes created, are operating in the state, and all corporations operating in the state, whether for profit or not, ought to be embraced within the provision of section 27 of the Laws of 1907, which is the same as section 9 of the act of 1898:

"Any corporation organized under the laws of another state, territory or foreign country, and authorized to do business in this state, shall be subject to the same provisions, judicial control, restrictions and penalties, except as herein provided, as corporations organized under the laws of this state." (Laws 1907, ch. 140, § 27.)

The statute which applies to the present controversy is the act of 1907, and if the intention of the legislature in passing the act has been correctly apprehended, it is not important that executive officers have neglected to enforce it according to its true meaning.

I concur in the judgment of ouster.