(No. 95337.—

VUONG Y. LEE, Special Adm'r of the Estate of Tak Kwon Lee, Deceased, Appellant, v. JOHN DEERE INSURANCE COMPANY, n/k/a Sentry Select Insurance Company, *et al.* (John Deere Insurance Company, Appellee).

*Opinion filed December 4, 2003.*

Michael W. Rathsack, of Chicago (Michael R. Richmond, of counsel), for appellant.

Danny L. Worker, Stephen R. Vedova and Mary F. Sitko, of Worker, Sitko & Hoffman, L.L.C., of Chicago, for appellee.

William T. Barker, of Sonnenschein, Nath & Rosenthal, of Chicago, for *amicus curiae* National Association of Independent Insurers.

JUSTICE KILBRIDE delivered the opinion of the court:

In this case we must decide whether the failure of an insurance company to comply strictly with the statutory requirement that it provide a space in its motor vehicle coverage application form for the applicant to sign or initial indicating a decision to reject uninsured-motorist coverage operates to impose underinsured-motorist coverage in an amount equal to the bodily injury liability limits. In a declaratory judgment action brought by the estate of a plaintiff killed in an accident, the circuit court answered that question in the affirmative and reformed the issued policy to provide underinsured-motorist insurance coverage equal to the bodily injury liability limits. The appellate court reversed and remanded. 334 Ill. App. 3d 807, 815. We granted leave to appeal. 177 Ill. 2d R. 315. We allowed the National Association of Independent Insurers leave to file a brief as *amicus curiae* in support of defendant John Deere Insurance Company. 155 Ill. 2d R. 345. We now reverse the judgment of the appellate court.

## BACKGROUND

In September 1994, Andy W.Y. Lin (Lin), president of Asia Distributors (Asia), a trucking firm, sought motor vehicle liability insurance coverage for Asia's delivery trucks through Elite Insurance Agency, Inc. (Elite), an insurance brokerage firm. Lin telephoned Michael Amwoza, president of Elite, and asked him to secure a cover-

age quote. He did not personally go to Elite's office and did not sign an application form. Elite sought a coverage quote from International Risk Placement (IRP), an agent for John Deere Insurance Company (Deere). After receiving the quote, Elite prepared a form entitled "Non-Fleet Transportation Application" based on information supplied by Lin. Amwoza submitted the completed form to IRP. The application form contained no signature line for the person or entity seeking coverage and contained no space for the applicant to indicate rejection of additional uninsured-motorist coverage as required by the Illinois Insurance Code (Insurance Code) (215 ILCS 5/143a—2 (West 1992)). Amwoza testified in a deposition that he explained to Lin his right to purchase uninsured and underinsured insurance coverage in an amount equal to the bodily injury liability limits and advised him of the changes in the premium. According to Amwoza, Lin did not wish to pay for the increased coverage. Lin denied that anyone had explained the coverage option to him.

On September 8, 1994, in accordance with Deere's custom, IRP, as Deere's agent, issued a temporary binder of coverage to Asia, effective September 2, 1994. The temporary binder provided bodily injury liability coverage in the amount of $1 million and uninsured/underinsured-motorist coverage with aggregate limits of $40,000. On that same date, IRP forwarded to Elite another form entitled "John Deere Insurance Company Selection/Rejection of Uninsured/Underinsured Motorist coverage—Illinois." This selection/rejection form was submitted to and filed by the Illinois Director of Insurance in 1992. It was designed to comply with the provision in the Insurance Code requiring insurance companies to describe briefly the uninsured-motorist coverage and to include a space indicating the applicant's rejection of that coverage in an amount equal to the bodily injury liability limit.

On September 12, 1994, Deere issued its insurance policy containing coverage identical to that described in the temporary binder, even though it had not yet received the selection/rejection form back from Elite. Deere then notified IRP that it had not yet received the signed selection/rejection form from Asia. IRP notified Elite that the signed form must be returned by October 28, 1994, or the policy would be canceled. A signed form was returned to IRP by Elite and in turn sent to Deere.

Deere canceled the policy for nonpayment of premium on November 17, 1994. Asia operated without coverage from that date until January 20, 1995, when a new policy was issued to reinstate coverage with Deere. Again, IRP sent a selection/rejection form to Elite, and again a signed form was returned to IRP by Elite only after Deere demanded it on threat of cancellation. This form was purportedly signed by Andy Lin, although Lin denied that the signature was his. The premium for the uninsured/underinsured coverage was based on the statutory minimum limits. The policy was renewed for the year 1996 and was in force on March 1, 1996. On that date, plaintiff's decedent Tak Kwon Lee, one of Asia's drivers, was killed in a collision between his delivery truck and a car.

The driver of the car was at fault, and that insurance carrier paid its $20,000 policy limit to Vuong Lee, the decedent's widow. Lee then made an underinsured-motorist claim against Deere. Because the parties could not agree on the amount of available coverage, Lee filed a declaratory judgment action in the circuit court of Cook County against Deere seeking a determination of the amount of coverage. Lee moved for summary judgment, contending that the application form lacked the required space for rejection of increased uninsured/underinsured coverage and thus violated section 143a—2(2) of the Insurance Code. Lee further argued that the separate

selection/rejection form was ineffective. The trial court granted summary judgment, finding that the application had no signature or initials indicating rejection of the additional coverage. The trial court then reformed the insurance policy to provide $1 million in underinsured-motorist coverage. The court did not address the validity or effect of the selection/rejection form.

Deere appealed, and the appellate court reversed, holding that the trial court misapplied the statute. 334 Ill. App. 3d at 808. Deere argued that *its* selection/rejection form was part of an ongoing application process and that the form complied with the statutory requirements. The reviewing court did not reach the question of compliance. Instead, it determined *sua sponte* that section 143a—2(2) applied only to uninsured-motorist coverage and not to underinsured-motorist coverage. Accordingly, the court held that since Lee's claim against Deere was for underinsured coverage, the application and signature requirements of the statute were both inapplicable and irrelevant. 334 Ill. App. 3d at 814.

## ANALYSIS

On appeal to this court, Lee argues that the appellate court misinterpreted the statute, claiming that uninsured- and underinsured-motorist coverages are linked together and that application procedures applicable to the former also apply to the latter. Because the question of the proper interpretation to be afforded statutory provisions is a question of law, our standard of review is *de novo. Knolls Condominium Ass'n v. Harms,* 202 Ill. 2d 450, 454 (2002). The plain language of the statute is the best indicator of the legislature's intent. *Allstate Insurance Co. v. Menards, Inc.,* 202 Ill. 2d 586, 591 (2002). When the statute's language is clear, it will be given effect without resort to other aids of statutory construction. *Petersen v. Wallach,* 198 Ill. 2d 439, 445 (2002).

Section 143a of the Insurance Code (215 ILCS 5/143a (West 1992)) mandates uninsured-motorist coverage in an amount equal to the $20,000/$40,000 minimum liability limits for bodily injury or death required by section 7—203 of the Illinois Vehicle Code (625 ILCS 5/7—203 (West 1992)).

Section 143a—2 of the Insurance Code (215 ILCS 5/143a—2 (West 1992)) sets out conditions and procedures for issuing or rejecting both uninsured- and underinsured-motorist coverage. Subsection (1) of section 143a—2 requires the insurance company to provide uninsured-motorist coverage in an amount equal to the bodily injury coverage unless specifically rejected by the insured and also requires the company to provide a brief description of the coverage and to advise applicants of their right to reject coverage in excess of the amounts required by section 7—203 of the Illinois Vehicle Code. 215 ILCS 5/143a—2(1) (West 1992).

Subsection (2) of section 143a—2 prescribes an exclusive means of effecting a rejection of additional coverage, providing in pertinent part as follows:

"After June 30, 1991, every application for motor vehicle coverage must contain a space for indicating the rejection of additional uninsured motorist coverage. No rejection of that coverage may be effective unless the applicant signs or initials the indication of rejection." 215 ILCS 5/143a—2(2) (West 1992).

Subsection (4) of section 143a—2 defines underinsured-motorist coverage and provides that no policy of insurance may be issued unless underinsured insurance is included in an amount equal to the uninsured-motorist coverage where the latter exceeds the minimum limits required by section 7—203 of the Illinois Vehicle Code. 215 ILCS 5/143a—2(4) (West 1992). The section contains no language allowing a rejection of underinsured-motorist coverage.

We have previously construed this section to provide

that whatever uninsured-motorist coverage the insured elects, underinsured-motorist coverage will be set, mandatorily, at the uninsured-motorist coverage level. *DeGrand v. Motors Insurance Corp.*, 146 Ill. 2d 521, 533 (1992). Thus, it is apparent that, as Lee argues, the two coverages are inextricably linked in the statute. If the rejection of uninsured-motorist coverage is ineffective because of a failure to comply with statutory requirements, it follows necessarily that coverage must be imposed in an amount equal to the bodily injury liability limits. Since underinsured coverage is mandatory where uninsured coverage in excess of the minimum statutory limits exists, it also follows that underinsured coverage, too, must be imposed in an amount equal to the bodily injury liability limits.

The appellate court analysis focused on the language in section 143a—2(2) that, if taken literally, appears to apply only to the rejection of uninsured coverage. The appellate court ignored, however, the result required by the language in section 143a—2(4), and that is to impose underinsured coverage in an amount equal to the uninsured coverage. Since the latter coverage would be equal to the bodily injury limit if the rejection were to be ineffective, so too would the former. Thus, we hold that the appellate court erred in holding that the application and signature requirements in section 143a—2(2) were inapplicable and irrelevant.

This holding is, however, not dispositive, because we must still decide whether Deere's selection/rejection form complied with the statute and determine what coverage existed at the time of the fatal accident. Although Deere argued before the trial court and the appellate court that its selection/rejection form was sufficient to comply with the statutory requirements, that issue was not ruled on by either tribunal. Deere repeats those arguments before us.

The selection/rejection form contained the following language:

"Illinois law requires that We, the Company providing the insurance, are required to provide to You, the Named Insured on the policy, higher limits for Uninsured/ Underinsured Motorist Coverage. These limits are to be equal to the policy limits provided for the Bodily Injury Liability Coverage. You have the right to select a lower limit for the Uninsured/Underinsured Motorist Coverage, but no lower than the Minimum Financial Responsibility requirement.

* * *

Uninsured/Underinsured Motorist Coverage provides insurance for the protection of persons who are legally entitled to recover damages from owners or operators of uninsured/underinsured motor vehicles because of bodily injury, including death resulting therefrom.

Therefore, please indicate your choice below by checking the appropriate box and signing this form which is to be returned to the company.

UNINSURED/UNDERINSURED
MOTORIST COVERAGE SELECTION/REJECTION

[ ] I choose to REJECT higher limits and coverage is requested for the minimum required to meet the Financial Responsibility Laws of the state."

This form also contains a brief description of uninsured-motorist coverage and advises applicants of their right to reject it. Further, the form provides a check box to indicate the applicant's choice. A date line and a signature line appear immediately below the check box.

That form, together with the "Non-Fleet Transportation Application Form," was submitted to the Department of Insurance with the appropriate fee, and accepted for filing. By law, the Director of Insurance must require the filing of all policy forms and may require the filing of any "generally used riders, endorsements, application blanks and other matter incorporated by reference in any such policy or contract of insurance." 215 ILCS 5/143(2) (West 1992). The same statute provides that "if

the Director shall find from an examination of any such policy form, rider, endorsement, certificate, application blank, or other matter incorporated by reference in any such policy so filed that it violates any provision of this Code, contains inconsistent, ambiguous, or misleading clauses, or contains exceptions and conditions that will unreasonably or deceptively affect the risks that are purported to be assumed by the policy, he shall order the company or companies issuing such forms to discontinue the use of the same." 215 ILCS 5/143(2) (West 1992).

Deere argues that because the Department allowed the filing of the selection/rejection form, it necessarily made a determination that the form does not violate the Insurance Code, contain inconsistent, ambiguous or misleading clauses, or contain exceptions and conditions that will unreasonably and deceptively alter the risks assumed under the policy. Since the separate application and selection/rejection forms were both filed, Deere argues, the Director has implicitly authorized the use of a rejection form that is not physically contained within the application. Lee counters that, since there is no indication in the record that the Director of Insurance required the filing of either the application or the selection/rejection form, and since the Director did nothing more than affix the Department file stamp to the documents, no inference of Department approval arises.

It is true, as Deere argues, that the approval of the Director is entitled to great weight, although it is not conclusive on the courts. *Kirk v. Financial Security Life Insurance Co.*, 75 Ill. 2d 367, 376 (1978). However, we cannot decide this issue on the basis of the Director's approval even if it was given. The application form and the selection/rejection forms are separate documents. The record conclusively establishes that the application form was submitted to Deere's agent without a completed selection/rejection form. The latter form was not executed

by the insured until after issuance of the actual policy of insurance, replacing the temporary binder. Thus, we must determine whether this two-step process operates to defeat the rejection of coverage in this case.

The selection/rejection form contains the requisite explanation of uninsured-motorist coverage, a space for rejection of the coverage, and a signature line. If this content appeared in the application form, it would be sufficient to accomplish a rejection of the coverage. Arguably, it could be sufficient if both forms were submitted simultaneously to the applicant, or if the selection/rejection form were separately submitted and signed prior to the issuance of the insurance policy. That, however, did not happen in the case before us.

Deere argues that the procedure used to complete the application process was commercially reasonable and consistent with prior Illinois precedent. Since coverage was initially secured through issuance of a temporary binder and since execution of the selection/rejection form was requested when the binder was issued, Deere argues that submission of that form was part of the application process.

This court has recognized that an insurance binder is in the nature of temporary insurance, that such a contract can be oral and that it will be presumed that the parties contemplate that a policy will be issued containing such conditions and limitations as are usual in such cases, or that have been used before between the parties. *Zannini v. Reliance Insurance Co. of Illinois, Inc.*, 147 Ill. 2d 437, 454-55 (1992), quoting *Devers v. Prudential Property & Casualty Insurance Co.*, 86 Ill. App. 3d 542, 544 (1980), quoting *Cottingham v. National Mutual Church Insurance Co.*, 290 Ill. 26, 33 (1919).

In *Anderson v. Vrahnos*, 149 Ill. App. 3d 251 (1986), the appellate court held that the legislature did not intend that binders should be considered policies for

purposes of the offer of underinsured-motorist coverage required by the version of section 143a—2 of the Insurance Code in effect at that time. Hence, a binder authorized by the insurance company did not, as a matter of law, include underinsured-motorist coverage.

The same rationale, Deere contends, applies to the current version of the statute and the effect of the binder issued by Deere. The statute does not require execution of the rejection form prior to issuance of a binder. Since Elite, on behalf of Asia, requested minimum limits of uninsured/underinsured-motorist coverage, that coverage was properly bound and higher limits were not imposed by operation of law. While the binder was in effect and pending completion of the application process, the company requested execution of the selection/rejection form. The company ran the risk of increased uninsured/underinsured-motorist exposure after issuing the policy and prior to receiving the executed selection/rejection form. Because the statute does not expressly require the form to be executed prior to the binder or before issuance of the actual policy, Deere contends that rejection of the coverage was effective when the form was executed by Lin. Deere argues also that since the executed form was returned before the accident occurred, the additional underinsured-motorist coverage was not then in effect.

A similar argument was rejected by the appellate court in *Wood v. National Liability & Fire Insurance Co.*, 324 Ill. App. 3d 583 (2001). That court affirmed summary judgment directing reformation of an insurance contract to provide uninsured/underinsured-motorist coverage equal to the bodily injury limits where a separate form rejecting the additional coverage was submitted after issuance of the policy. The initial application form did not contain a provision for the rejection of the additional coverage. Thus, the additional coverage was contained in the policy at the time it was issued. *Wood*, 324 Ill. App. 3d at 586-87. The court reasoned:

"[I]t is clear that the legislature intended the application process to cease once an insurance policy is issued. In 1990, the legislature modified section 143a—2 so that the word 'applicant' replaced the word 'insured.' [Citation.] Before the change, the 'insured' had the right to elect or reject [uninsured-motorist] coverage. In its present form, the statute 'leaves no room for doubt as to whom [uninsured-motorist] coverage must be explained.' [Citation.] We believe that the revision makes it clear that the applicant, not the insured, be provided with a description of the [uninsured-motorist] coverage and that the applicant be given an opportunity to reject the coverage. The alteration is significant because it is the applicant who needs to know the extent and amount of his or her coverage *before* he or she agrees to enter into a contract of insurance.

On the date the election form was signed, Wood was no longer an applicant because he had been issued a policy. Therefore, the election form could not serve as a valid rejection of the [uninsured/underinsured-motorist] coverage." (Emphasis in original.) *Wood*, 324 Ill. App. 3d at 587.

The court further noted that once the policy was issued, the application process was complete. Thus, the company's argument that the application process was "ongoing" was unavailing. *Wood*, 324 Ill. App. 3d at 587.

The *Wood* rationale was examined in *Isaacson v. Country Mutual Insurance Co.*, 328 Ill. App. 3d 982 (2002), where the court held that a coverage rejection executed after issuance of the policy was effective when the policy originally provided uninsured-motorist coverage equal to the bodily injury limits, but was reduced on the insured's express request in return for a reduction in premium. The court held that *Wood* was inapposite because in that case the policy was issued with the reduced limits before execution of the rejection form. *Isaacson*, 328 Ill. App. 3d at 986.

A postissuance endorsement to a valid policy is not necessarily prohibited by any statute and, indeed, that

alternative was recognized as valid in *Wood*, where the court observed:

> "Moreover, once the rejection form had been executed, National could have issued an addendum or a new policy reflecting the change in [uninsured/underinsured-motorist] limits." *Wood*, 324 Ill. App. 3d at 588.

Here, Deere did not use either alternative. Therefore, the untimely rejection had no effect. While Deere argues that the application process was ongoing and that the return of the rejection form was part of this process, there appears to be no justification for Deere to issue the policy before receipt of the selection/rejection form. Under the plain language of the statute, Deere *could not* have lawfully issued the policy without uninsured/ underinsured-motorist coverage equal to the bodily injury limits. Accordingly, these limits were in effect when the insured's employee was killed in a covered accident. For Lin's rejection of the additional coverage to be effective, Deere's two-step application process must have been completed before the issuance of the policy. In the absence of a complying rejection, Deere was in violation of the statute when it issued the policy, and no subsequent rejection of the additional coverage could have been valid unless of course, as in *Isaacson*, the additional coverage was provided under the original policy.

Finally, we address the "practicality" arguments urged by Deere and its *amicus*. The application process began with a telephone call from Lin to Amwoza at Elite. Amwoza obtained the information he needed to secure a quote and then submitted the application, unsigned, to Deere on Lin's behalf. Deere and its *amicus* note that this practice is common in the insurance industry and argue that it is commercially reasonable. The trial court found that reformation of the policy was required because the application submitted by Elite contained no signature or initials indicating rejection of the additional coverage. Deere and its *amicus* contend that if the trial court's rul-

ing were upheld, applicants could no longer quickly obtain coverage, as might be necessary in many situations, by means of a temporary binder of insurance procured by telephone. This is an argument better addressed to the legislature.

Given our disposition of this case, however, the concerns of Deere and its *amicus* are not well founded. Our holding is not based on the lack of a signature on the application form submitted on Lin's behalf by Elite. Rather, the result we reach is compelled because the rejection of coverage equal to bodily injury limits did not occur during the application process while the temporary binder was in effect. This case does not require us to determine whether the binder must initially include the higher coverages. Not until after the insurance policy was issued with uninsured/underinsured motorist limits at the statutory minimum was the selection/rejection form completed by Lin. Since Lin was no longer an "applicant," this procedure clearly was not authorized by the statute. The trial court properly granted summary judgment to Lee.

## CONCLUSION

For the reasons we have discussed, we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*