# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Young America's Foundation v. Doris A. Pistole Revocable Living Trust*,
**2013 IL App (2d) 121122**

---

| | |
|---|---|
| Appellate Court Caption | YOUNG AMERICA'S FOUNDATION, Plaintiff-Appellant, v. THE DORIS A. PISTOLE REVOCABLE LIVING TRUST, DAVID CAPPELLO and MARK CAPPELLO as Successor Trustees of the Doris A. Pistole Revocable Living Trust, and LISA MADIGAN, Attorney General for the State of Illinois, Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2-12-1122 |
| Filed | August 20, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiff not-for-profit corporation's action seeking to enforce a charitable pledge made by decedent was improperly dismissed as untimely, even though plaintiff was not registered with the Illinois Secretary of State and lacked the capacity to sue defendants when plaintiff's action was first filed, since plaintiff was entitled to cure its lack of capacity to sue by obtaining a certificate of authority from the Secretary of State, which plaintiff did before defendants filed their motion to dismiss, and when plaintiff refiled its action within one year of its voluntary dismissal of the initial suit, the filing date related back to the date of the initial filing pursuant to section 13-217 of the Code of Civil Procedure, and that date was prior to the expiration of the statute of limitations. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 11-CH-4826; the Hon. Terence M. Sheen, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Whitman H. Brisky, Amy J. Parrish, and Noel W. Sterett, all of Mauck & Baker, LLC, of Chicago, for appellant. |
|---|---|
| | Jeffrey J. Kabbe and Natalia Kabbe, both of Kabbe Law Group, LLC, of Naperville, for appellees. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. Justices Hutchinson and Hudson concurred in the judgment and opinion. |

**OPINION**

¶ 1    On February 23, 2013, the circuit court of Du Page County dismissed the first three counts of the complaint filed by the plaintiff, the Young America's Foundation, against the defendants, the Doris A. Pistole Revocable Living Trust, the trustees of that trust (David and Mark Cappello), and the Illinois Attorney General. The dismissal was based on the trial court's finding that these three counts were untimely filed. The plaintiff appealed. We reverse and remand.

¶ 2                    I. FACTUAL BACKGROUND
¶ 3                        A. The Plaintiff
¶ 4    The plaintiff is a Tennessee not-for-profit corporation. Its main offices are in Virginia and California. At the time in question, it did not maintain an office in Illinois. According to the complaint, "[i]n furtherance of Ronald Reagan's legacy," the plaintiff is "committed to ensuring that increasing numbers of young Americans understand and are inspired by the ideas of individual freedom, a strong national defense, free enterprise, and traditional values." To advance this purpose, the plaintiff works with students and student organizations to help them promote conservative ideas, by providing them with "activity ideas" and helping them "implement these ideas on their respective campuses."

¶ 5    Although the plaintiff provided much of this encouragement and educational material from outside Illinois, the plaintiff also engaged in the following activities within Illinois during the relevant period. In May 2003, two of the plaintiff's staff members met with Doris Pistole and her husband in Chicago regarding a possible bequest. (At this point, the record does not contain any evidence regarding whether the plaintiff's staff has met with other potential donors within Illinois.) Between March 2008 and June 2011, the plaintiff sponsored eight lectures bringing conservative speakers to Illinois colleges and universities. When the plaintiff sponsored such lectures, it typically paid the speakers' travel and lodging expenses and sometimes part of the honoraria. The plaintiff was identified as an event sponsor and its

-2-

logo appeared in promotional materials and displays on the podium or stage. Members of the plaintiff's staff usually did not attend these lectures, although on one occasion a staff member attended a lecture at Loyola University. In April 2008, the plaintiff held a "Rawhide Retreat" in Springfield, at which 75 attendees from a number of states gathered to hear conservative speakers and honor donors. Eight members of the plaintiff's staff were present at this retreat. In March 2009, the plaintiff and other groups sponsored a "Midwest Conference" in Chicago "to bring together student leaders to promote conservative ideas." Five staff members were present at this conference. Finally, the plaintiff regularly directs letters, phone calls, and emails aimed at soliciting donations and promoting its purpose into Illinois from its offices outside the state.

¶ 6    According to the complaint, "at all relevant times" the plaintiff was registered with the Illinois Attorney General's Charitable Trust Bureau to solicit donations in Illinois. However, the plaintiff did not obtain a separate certificate of authority to conduct affairs in Illinois from the Secretary of State's office until September 9, 2011. According to the plaintiff, after it received the certificate of authority it began chartering student organizations in Illinois, and it now has three local chapters.

¶ 7                                      B. The Trust

¶ 8    Doris and her husband had no children. David and Mark Cappello were two of Doris's nephews. In 1996, Doris and her husband executed a trust agreement that created the Doris A. Pistole Revocable Living Trust. The trust was amended once in 2002. At some point during the next few years, Doris's husband died. There were no further amendments to the trust until 2009.

¶ 9    The complaint states that Doris first advised the plaintiff in 2003 that she planned to give the plaintiff a substantial donation upon her death. Doris repeated this intention to members of the plaintiff's staff over the next several years, as late as December 2009, a few months before she died. According to the plaintiff, in 2008 Doris stated that her bequest to the plaintiff would be $2 million.

¶ 10    In January 2009, Doris was diagnosed with lung cancer. Her condition worsened, and by December 2009 she had contracted pneumonia and was bedridden. Doris died on February 22, 2010.

¶ 11    During 2009, Doris contacted an attorney, Alice Wood, to assist her in preparing amendments to the trust. Four successive amendments were prepared during 2009. The terms of the original trust and the first four amendments are not in the record.

¶ 12    The fifth amendment was executed by Doris on January 6, 2010. Under the fifth amendment, various persons, including David and Mark Cappello, received specific bequests of up to $250,000. The remainder was to be split between the plaintiff and another conservative organization, the Heritage Foundation, with the result that each organization would receive approximately $2 million. David and Mark Cappello were named as successor trustees.

¶ 13    Almost immediately after Doris signed the fifth amendment, Wood prepared a sixth amendment. According to the plaintiff, the sixth amendment was the result of improper

actions by David and Mark Cappello. The defendants dispute this and assert that the sixth amendment came about because the repeal of all federal and state estate taxes in January 2010 made certain charitable dispositions less attractive. Regardless of the reason, the sixth amendment provided that David and Mark Cappello were to receive almost $1 million each and that other persons also would receive specific bequests. These bequests amounted to 100% of the estate. Charitable organizations, including the plaintiff, were to receive only that portion of the estate which would otherwise be taxable. Doris executed the sixth amendment on January 18, 2010.

¶ 14     The complaint alleges that, by February 12, 2010, Wood "became aware" that the sixth amendment did not reflect Doris's true wishes for her estate, and a seventh amendment was prepared that would have capped the total amount of distributions to individuals at $2 million, with the remainder being divided between the plaintiff and the Heritage Foundation. It appears that Doris did not sign the seventh amendment before her death on February 22, 2010. Shortly thereafter, the plaintiff was advised that, because none of Doris's estate was taxable under the laws then in effect, the plaintiff would receive no distributions from the trust.

¶ 15                           II. PROCEDURAL HISTORY

¶ 16     On August 3, 2010, the plaintiff filed suit in case No. 10-CH-4298 (the First Action) against the trust, the trustees, and the Attorney General.[1] The complaint alleged a breach of fiduciary duty and sought to enforce a charitable pledge. After moving unsuccessfully to dismiss on grounds not relevant here, the defendants filed their answer, affirmative defenses, and counterclaim on January 5, 2011. One of the affirmative defenses raised by the defendants was that the plaintiff was barred from bringing suit by section 113.70 of the General Not for Profit Corporation Act of 1986 (Not for Profit Act or Act) (805 ILCS 105/113.70 (West 2010)). That provision, which is titled "Conducting affairs without authority," states:

> "No foreign corporation conducting affairs in this state without authority to do so is permitted to maintain a civil action in any court of this State, until such corporation obtains such authority." 805 ILCS 105/113.70 (West 2010).

The defendants did not move to dismiss the complaint in the First Action on the basis that the plaintiff lacked capacity to sue under section 113.70. Over the next few months, the plaintiff twice amended its complaint, adding claims of undue influence and lack of testamentary capacity.

¶ 17     In August 2011, the plaintiff filed a motion to voluntarily dismiss its suit. On September 7, 2011, before that motion was heard, the plaintiff applied to the Secretary of State for a certificate of authority to conduct affairs in Illinois as a not-for-profit corporation. The application was granted, and the plaintiff received its certificate of authority on September

---

[1]The plaintiff also filed a separate suit against Wood, alleging legal malpractice. The dismissal of that suit is the subject of a companion appeal pending before a separate panel of this court, *Young America's Foundation v. Wood*, No. 2-12-0611.

9, 2011. On September 14, 2011, the trial court granted the plaintiff's motion to voluntarily dismiss the First Action.

¶ 18    On October 12, 2011, the plaintiff refiled its suit as case No. 11-CH-4826 (the Second Action). The complaint in the Second Action, which is the subject of this appeal, contained: (1) a claim to enforce Doris's charitable pledge agreements, brought against all defendants (count I); (2) a claim of undue influence, asserted against the trustees (count II); (3) a claim that Doris lacked testamentary capacity, asserted against the trust and the trustees (count III); and (4) a claim that the trustees breached their fiduciary duty (count IV).

¶ 19    The defendants moved to dismiss the Second Action pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2010)). In their motion, the defendants argued that all of the claims were barred by the applicable statutes of limitations, because the case was filed after the limitations periods had expired. Moreover, the "saving" provision of section 13-217 of the Code (735 ILCS 13-217 (West 2010))–which permits plaintiffs to refile within one year timely suits that were voluntarily dismissed, without regard to whether the limitations periods have since expired–did not apply, because under section 113.70 of the Not for Profit Act the plaintiff lacked the capacity to bring the First Action. The defendants pointed out that the plaintiff did not receive its certificate of authority to conduct affairs until September 2011, several months after the limitations periods for the claims had expired. Accordingly, they argued, the First Action was a nullity and the claims in the Second Action could not relate back to the filing date of the First Action.

¶ 20    In response, the plaintiff argued that, because it had limited contacts and activities within Illinois, it had not been "conducting affairs" within the meaning of section 113.70 of the Not for Profit Act and therefore it was not required to obtain authority. The plaintiff also argued that it obtained a certificate of authority while the First Action was still pending, thereby curing any defect that might have existed when it filed the First Action, with the result that the saving provision of section 13-217 of the Code applied and rendered the Second Action timely.

¶ 21    After briefing and oral argument, on February 23, 2012, the trial court issued a memorandum opinion granting the motion to dismiss as to the first three counts of the complaint. (The claim for breach of fiduciary duty in count IV was subject to a five-year limitations period that had not expired, and that claim remains pending in the trial court.) The trial court found that, based upon an affidavit submitted by the plaintiff and other uncontested evidence, the plaintiff had been "conducting affairs" in Illinois and therefore could not maintain suit in an Illinois court without a certificate of authority. The court held that the fact that the plaintiff had no such authority meant that the First Action was, in essence, a nullity. Moreover, the plaintiff had not remedied its lack of authority until September 2011, several months after the limitations periods expired for the claims asserted in the first three counts. (The limitations periods expired in January 2011 for counts II and III and March 2011 for count I.) Because the plaintiff lacked the capacity to maintain suit in Illinois until after the relevant limitations periods expired, the saving provision did not apply, and the first three counts were untimely. After denying the plaintiff's subsequent motion to reconsider, the trial court made a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) that there was no just reason to delay enforcement or appeal of

-5-

the dismissal of the first three counts. This appeal followed.

¶ 22                                    III. ANALYSIS

¶ 23        Before considering the substance of this appeal, we pause to note the plaintiff's suggestion (raised in a footnote to its opening brief and discussed at slightly greater length in its reply brief) that the defendants should not have been permitted to raise their argument regarding lack of corporate capacity to sue, because they had forfeited that argument by not raising it in their motion to dismiss the First Action. The footnote contains no citation to legal authority and is insufficient to bring this argument before us. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013). Even if it were not, the facts do not support it: the defendants promptly raised this affirmative defense in their answer to the initial complaint. The plaintiff cites no support for its argument that this was insufficient to preserve the defense. Moreover, the plaintiff concedes that its initial complaint incorrectly alleged that it was properly registered in Illinois, and the defendants assert that they did not learn the truth until after they had moved to dismiss on other grounds. Thus, the equities do not support forfeiture of the defendant's argument. We therefore turn to the plaintiff's more substantive arguments.

¶ 24        The plaintiff's arguments on appeal center around two contentions: first, that the trial court erred in finding that the plaintiff was "conducting affairs" in Illinois and was required to obtain a certificate of authority; and second, that any lack of capacity when it filed the First Action was cured when it obtained its certificate of authority in September 2011, and the trial court therefore erred in dismissing counts I through III of the Second Action. Both of these contentions involve issues of statutory interpretation, which we consider *de novo*. *Julie Q. v. Department of Children & Family Services*, 2013 IL 113783, ¶ 20. Likewise, we review *de novo* the grant of a section 2-619 motion to dismiss. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006).

¶ 25        In construing a statute, our task is to "ascertain and give effect to the legislature's intent." *Lieb v. Judges' Retirement System of Illinois*, 314 Ill. App. 3d 87, 92 (2000). The best indicator of the legislature's intent is the plain language of the statute. *Lee v. John Deere Insurance Co.*, 208 Ill. 2d 38, 43 (2003). "When the statute's language is clear, it will be given effect without resort to other aids of statutory construction." *Id.*

    "However, if a statute is capable of being understood by reasonably well-informed persons in two or more different ways, the statute will be deemed ambiguous. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 11 (2009). If the statute is ambiguous, the court may consider extrinsic aids of construction in order to discern the legislative intent. [*Id.*] We construe the statute to avoid rendering any part of it meaningless or superfluous. [*In re Marriage of*] *Blum*, 235 Ill. 2d[ 21, 29 (2009)]. We do not depart from the plain statutory language by reading into it exceptions, limitations, or conditions that conflict with the expressed intent. [*Id.*]

    We may also consider the consequences that would result from construing the statute one way or the other. *Landis*, 235 Ill. 2d at 12. In doing so, we presume that the legislature did not intend absurd, inconvenient, or unjust consequences. [*Id.*]" *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 440-41 (2010).

### A. Whether the Plaintiff Was Required to Obtain Authority

Section 101.70(b)(3) of the Not for Profit Act (805 ILCS 105/101.70(b)(3) (West 2010)) provides that the Act applies to "[a]ll foreign not-for-profit corporations conducting affairs in this State" for any permissible charitable purpose. Permissible purposes for not-for-profit corporations are listed in section 103.05 of the Act (805 ILCS 105/103.05 (West 2010)) and include educational, civic, patriotic, and political purposes. The plaintiff describes itself as "an educational organization that works with *** students and student organizations to help them advance conservative ideas through the exercise of their First Amendment rights." There is no dispute that the plaintiff is within the class of not-for-profit organizations covered by the Not for Profit Act.

Section 113.05 of the Act states that "[a] foreign corporation organized not for profit, before it conducts any affairs in this State, shall procure authority so to do from the Secretary of State." 805 ILCS 105/113.05 (West 2010). Under the plain language of these provisions, the plaintiff was required to apply to the Secretary of State for authority if it was "conducting affairs" in Illinois, or planned to do so. The question arises, then, as to what the legislature meant by the phrase "conducting affairs."

### 1. The Meaning of "Conducting Affairs"

The phrase "conducting affairs" is not defined in the Not for Profit Act. The Business Corporation Act of 1983 (Corporation Act) (805 ILCS 5/1.01 *et seq.* (West 2010)) is in many ways a sister statute to the Not for Profit Act, containing similar provisions that regulate the formation of domestic for-profit corporations and the operation of foreign and domestic for-profit corporations within Illinois. The Corporation Act uses the phrase "transacting business" instead of "conducting affairs." See, *e.g.*, 805 ILCS 5/13.05 (West 2010) ("a foreign corporation organized for profit, before it transacts business in this State, shall procure authority so to do from the Secretary of State"). Although the Corporation Act does not directly define the term "transacting business," it does supply some guidance via a provision listing activities that do *not* constitute "transacting business." That provision specifies that conducting certain activities within Illinois, such as holding board meetings, maintaining bank accounts, "selling through independent contractors," "soliciting or obtaining orders [that] require acceptance outside this State," and the like, by themselves do not demonstrate that a foreign corporation is "transacting business" in Illinois for the purposes of the Corporation Act. 805 ILCS 5/13.75 (West 2010).

The definition of "transacting business" is also subject to a separate restriction not contained in the Corporation Act: activities that constitute interstate commerce may not be used to trigger in-state registration requirements (or penalize unregistered corporations by barring them from suing), because that would create local burdens upon interstate commerce, in violation of the commerce clause (U.S. Const., art. I, § 8). In *Textile Fabrics Corp. v. Roundtree*, 39 Ill. 2d 122, 124-25 (1968), our supreme court held that the provision in the Corporation Act barring unregistered corporations from bringing suit could not be given effect in that case, because the plaintiff's activities in Illinois were wholly interstate in nature and to enforce the statutory bar would "impede the Federal authority and responsibility to

insure the free flow of interstate commerce."

¶ 32    The plaintiff argues that the phrase "conducting affairs" in the Not for Profit Act is "directly analogous" to the phrase "transacting business" in the Corporation Act. We agree that, although much of the analysis in the cases interpreting the Corporation Act naturally focuses on business and commerce, in general the two phrases are used in an analogous manner. Nevertheless, in interpreting the term "conducting affairs," we do not believe that we should import wholesale the analysis relating to the term "transacting business." To begin with, the language and structure of these two statutes are distinct on the relevant issue. The legislature provided some clarification of "transacting business" in section 13.75 of the Corporation Act but chose not to include a similar provision in the Not for Profit Act. In addition, the usual meaning of "business" connotes commercial activity, but not-for-profit organizations are not primarily oriented toward commercial activity. Finally, the Corporation Act provides for the collection of corporate taxes, but not-for-profit corporations generally are not subject to such taxes. Accordingly, rather than applying the Corporation Act's definition of "transacting business," we prefer to focus directly on the meaning of "conducting affairs" in the context of the Not for Profit Act, drawing on the principles of statutory analysis and the decisions of our sister states that have considered the proper scope of similar statutes.

¶ 33    As noted above, the best indicator of the legislature's intent is the plain language of the statute. *Lee*, 208 Ill. 2d at 43. Here, the meaning of "conducting affairs" is not ambiguous. "Conducting" is synonymous with "doing." "Affairs" is readily understood as referring to the matters, concerns, or business in which one is engaged. See Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/affair (last visited on June 17, 2013) (defining "affair" as "matter" or "concern" and "affairs" as "commercial, professional, public, or personal business").

¶ 34    Over 100 years ago, our supreme court commented that the phrase "doing business in this state" means "doing the business or character of business for which the corporation was organized" (*People ex rel. Stead v. Chicago, Indianapolis & Louisville Ry. Co.*, 223 Ill. 581, 588 (1906)), and that definition remains in use today (see, *e.g.*, *Wenige-Epperson, Inc. v. Jet Lite Products, Inc.*, 28 Ill. App. 3d 320, 322 (1975)). This definition need be adapted only slightly to fit not-for-profit corporations. In the context of such corporations, "conducting affairs" means carrying on activities that further the charitable, educational, or other purposes for which the not-for-profit organization was created.

¶ 35    This definition of "conducting affairs" has been applied by courts in other states considering the application of their foreign corporation laws to not-for-profit corporations. For instance, in *State ex rel. Griffith v. Knights of Ku Klux Klan*, 232 P. 254 (Kan. 1925), the Kansas Supreme Court considered whether the Ku Klux Klan, a not-for-profit corporation organized under the laws of Georgia, was "doing business" in Kansas. It began by rejecting the argument that charitable organizations could never be said to be transacting "business" because they were not engaged in commercial or business enterprise: "The [']business['] of a corporation organized *** for the support of benevolent, charitable, educational, or missionary undertakings is *** to support benevolent, charitable, educational, or missionary undertakings ***." *Id.* at 258. The court concluded that the Klan's activities in Kansas,

which included owning real property, holding and administering regalia and other personal property, and founding and overseeing member groups, constituted "doing business" within the meaning of Kansas foreign corporation laws. *Id.* at 260.

¶ 36     A number of courts in other states have similarly held that a not-for-profit corporation is transacting "business" in a state when it performs the functions for which it was organized. See, *e.g.*, *Galatz v. Eighth Judicial District Court*, 683 P.2d 26, 28 (Nev. 1984) (" 'A non-profit corporation's business is whatever functions it has been organized to perform.' " (quoting *Steel Joist Institute, Inc. v. J.H. Mann, III, Inc.*, 171 So. 2d 625, 627 (Fla. Dist. Ct. App. 1965))); *People v. Jewish Consumptives Relief Society*, 92 N.Y.S.2d 157, 158 (N.Y. Sup. Ct. 1949) (statutory definition of for-profit corporations' "business"–" 'the activities for which such corporation shall have been organized' "–applied equally to nonprofit membership corporations (quoting Gen. Corp. Law art. 13, § 220)); *High v. Supreme Lodge of the World, Loyal Order of Moose*, 289 N.W. 519, 521 (Minn. 1940) (foreign nonprofit corporation was engaged in "business" in Minnesota where its social and charitable objectives were accomplished through its local lodge); *Pacific Typesetting Co. v. International Typographical Union*, 216 P. 358, 360 (Wash. 1923) ("the effort in any community to secure" the results that are the "major purposes and the principal activities" of nonprofit organizations constitutes "the very business for which they continue their existence"). We thus have no hesitation in defining "conducting affairs" as "engaging in the activities or functions for which the not-for-profit organization was formed."

¶ 37     The plaintiff argues that this basic definition of "conducting affairs" must be subject to some limits of the type normally applied to for-profit corporations, such as the restriction that a corporation engaged solely in interstate activities cannot be required to obtain a certificate of authority before it may maintain suit. See *Roundtree*, 39 Ill. 2d at 125; *Browning, Ektelon Division v. Williams*, 256 Ill. App. 3d 299, 302 (1993) ("standing to sue cannot be denied to a foreign corporation when the basis of the lawsuit is a transaction involving interstate commerce"). It is unclear whether the constitutional concern that gave rise to this restriction–the need to avoid hampering interstate commerce through burdensome regulations–applies with equal force in the context of not-for-profit corporations. (The plaintiff asserts that this is so, but the citation it provides does not support the assertion.) We also note that not every burden upon interstate commerce violates the commerce clause. See *General Motors Corp. v. Illinois Motor Vehicle Review Board*, 224 Ill. 2d 1, 27-28 (2007) (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

¶ 38     Similarly, the plaintiff argues that, like "transacting business," the definition of "conducting affairs" must be limited so that it excludes isolated or sporadic activities within a state. In the context of for-profit corporations, this limitation is imposed by section 13.75 of the Corporation Act, which provides that the term "transacting business" does not apply to certain activities, including "conducting an isolated transaction that is completed within 120 days and that is not one in the course of repeated transactions of a like nature." 805 ILCS 5/13.75(10) (West 2010); see also *Charter Finance Co. v. Henderson*, 60 Ill. 2d 323, 327-28 (1975) (similar common-law restriction).

¶ 39     We do not necessarily quarrel with either of these proposed limitations on the activities to be considered in assessing whether a not-for-profit corporation is "conducting affairs" in

Illinois such that it is required to apply to the Secretary of State for authority. However, we need not decide the issue here, because, with or without these limitations, we would reach the same result.

¶ 40          2. Whether the Plaintiff Was Conducting Affairs in Illinois

¶ 41     We now turn to the question of whether the trial court erred in finding that the plaintiff was conducting affairs in Illinois. A lack of capacity to sue is an affirmative defense on which the defendant bears the burden of proof. *Career Concepts, Inc. v. Synergy, Inc.*, 372 Ill. App. 3d 395, 403 (2007). Here, the evidence regarding the plaintiff's activities in Illinois is drawn almost entirely from the allegations of the complaint and an affidavit submitted by Kimberly Martin Begg, the plaintiff's director of planned giving.[2] Accordingly, we review *de novo* the trial court's determination that the defendants met their burden of proof on this issue. *NAB Bank v. LaSalle Bank, N.A.*, 2013 IL App (1st) 121147, ¶ 14 (where trial court did not hear testimony and decided the issue solely on the basis of documentary evidence, ordinary deferential standard of review is inapplicable, and reviewing court will make an independent determination on the facts). We conclude that the trial court did not err in finding that the plaintiff was conducting affairs in Illinois and was thus required to obtain authority from the Secretary of State.

¶ 42     There is no doubt that, in working actively with student groups on Illinois campuses, holding conferences in Illinois, meeting with donors in Illinois, and sponsoring lectures in Illinois, the plaintiff was engaged in activities that promoted the purposes for which it was created. Further, although tangential aspects of these activities may have involved interstate processes such as using the mails or Internet, the activities themselves were meant to be, and were, performed specifically in Illinois. The activities were meant to reach Illinois students and donors, and to persuade them to carry on the plaintiff's work in Illinois. These activities were not isolated or sporadic. Rather, they reflected continuous and purposeful efforts by the plaintiff, beginning no later than 2008 and extending through the present, to promote in Illinois the plaintiff's mission. Thus, regardless of whether interstate activities and isolated activities are excluded from consideration, we affirm the trial court's findings that the plaintiff was conducting affairs in Illinois and was required to seek authority to do so from the Secretary of State under section 113.05 of the Not for Profit Act.

¶ 43          B. Whether the Failure to Obtain Authority Was Curable

¶ 44     The statute at issue in this case states that "[n]o foreign corporation conducting affairs in this state without authority to do so is permitted to maintain a civil action in any court of

---

[2]The plaintiff argues on appeal that the trial court should have conducted an evidentiary hearing before deciding whether the plaintiff was "conducting affairs" in Illinois. This argument fails because: (1) the evidence before the trial court was supplied by the plaintiff, and thus there was no need to grant a second bite at the apple; and (2) the plaintiff cites no support whatsoever for this argument in its brief on appeal, thereby forfeiting it. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *Mikolajczyk v. Ford Motor Co.*, 374 Ill. App. 3d 646, 677 (2007).

this State, until such corporation obtains such authority." 805 ILCS 105/113.70 (West 2010). Statutes such as this, which close the courthouse door to noncomplying foreign corporations, are known as "door-closing" or "closed-door" laws. Such laws have been enacted in every state.

¶ 45    The defendants have met their burden of showing that the plaintiff was conducting affairs in Illinois without authority. The remaining question is whether the statute's bar on "maintaining" a civil action "until" a corporation obtains the necessary authority means (a) that the plaintiff could not file a suit at all (and that any suit it did file was a nullity), or (b) that the plaintiff could file a suit but could not continue it or obtain a judgment unless it complied with the registration requirement. We find that the latter interpretation is correct.

¶ 46    In this case, the trial court interpreted "maintain" to mean "commence" and found that section 113.70 of the Act barred the plaintiff from commencing the First Action, and so that action was a nullity. This was error. Generally speaking, a suit is a "nullity" only when some jurisdictional defect renders it void *ab initio*. "A void order or judgment is, generally, one entered by a court without jurisdiction of the subject matter or the parties, or by a court that lacks the inherent power to make or enter the order involved." *Ford Motor Credit Co. v. Sperry*, 214 Ill. 2d 371, 379-80 (2005). In *Sperry*, the supreme court rejected the argument that, because a law firm had failed to register as a professional service corporation under Illinois Supreme Court Rule 721(c) (eff. Mar. 1, 1997), a previous court order awarding attorney fees to the law firm was void. *Sperry*, 214 Ill. 2d at 386. In the context of foreign corporation registration requirements, it is well settled that a foreign corporation's lack of capacity to sue does not deprive a court of jurisdiction over the corporation's suit, but rather is an affirmative defense that may be raised by the defendant. *Amerco Field Office v. Onoforio*, 22 Ill. App. 3d 989, 993 (1974). In this case, the trial court had both personal and subject matter jurisdiction in the First Action, and thus the plaintiff's lack of capacity did not render the First Action void or a nullity.

¶ 47    What, then, is the intended meaning of "maintain" as it is used in section 113.70 of the Act, and how should that section be applied? The term "maintain" is ambiguous. As our supreme court has noted, "[t]o 'maintain' a legal action may mean either 'to commence' or 'to continue' the action." *In re Marriage of Burgess*, 189 Ill. 2d 270, 275 (2000). Accordingly, we look to extrinsic aids of statutory interpretation to determine which meaning the legislature intended, viewing the statute as a whole, considering the consequences of each possible interpretation, and avoiding unjust or absurd results. *Landis*, 235 Ill. 2d at 12; see also *Burgess*, 189 Ill. 2d at 278-79 (looking to the purpose of the statute at issue and the policy reasons supporting various interpretations of statutory language).

¶ 48    In this case, the purpose of the statute at issue is to encourage foreign not-for-profit corporations to comply with the requirement of providing information to the Secretary of State in the course of applying for authority to conduct affairs, thereby protecting the public from unscrupulous or fly-by-night companies. See Laura E. Little, *Out of Woods and Into the Rules: The Relationship Between State Foreign Corporation Door-Closing Statutes and Federal Rule of Civil Procedure 17(b)*, 72 Va. L. Rev. 767, 770 (1986) (purpose of foreign corporation laws is to provide access to information on such corporations' management and finances). The language of section 113.70 reflects this purpose, imposing the bar on

maintaining an action only "until" the corporation complies with its regulatory obligations. 805 ILCS 105/113.70 (West 2010). Thus, the Act is primarily intended to coerce compliance, not punish noncompliance.

¶ 49     Under other provisions of the Not for Profit Act, the authority of a foreign not-for-profit corporation to conduct affairs in Illinois can be revoked for various reasons (805 ILCS 105/113.50 (West 2010)), but a foreign corporation whose authority has been revoked can seek reinstatement of that authority (805 ILCS 105/113.60 (West 2010)). Significantly, the Act provides that, "[u]pon the filing of the application for reinstatement, the authority of the corporation to conduct affairs in this State [and the validity of the acts of the corporate officers and directors] shall be deemed to have continued without interruption," disregarding the period of incapacity as if it had never occurred. 805 ILCS 105/113.60(d) (West 2010). The Act also contains similar provisions–regarding administrative dissolution and subsequent reinstatement–that apply to not-for-profit corporations organized in Illinois. See 805 ILCS 105/112.35, 112.45(d) (West 2010).

¶ 50     The defendants argue that the Corporation Act contains a saving provision that has no parallel in the Not for Profit Act. This is not correct. Both statutes have clauses providing that the dissolution of a corporation does not "prevent suit by *** the corporation in its corporate name" (805 ILCS 5/12.30(c)(4) (West 2010); 805 ILCS 105/112.30(c)(4) (West 2010)) and that a corporation dissolved for reasons *not* involving noncompliance with the statute may bring suit on any claim it possesses within a certain period of time (see 805 ILCS 5/12.80 (West 2010) (five years); 805 ILCS 105/112.80 (West 2010) (two years)). Additionally, apart from the main closed-door provisions, both statutes provide that a corporation required to pay a penalty because of nonpayment of taxes or fees may not "maintain any civil action until all such [taxes, fees, interest and/or penalties] have been paid in full." 805 ILCS 5/15.85(c) (West 2010); 805 ILCS 105/115.85(c) (West 2010). As the plaintiff correctly notes, although the language of the two statutes differs in defining which corporations are required to register and in taxing certain for-profit corporations, the provisions relating to the remedies for any violation are identical. And, read as a whole, all of these provisions embody a view that a lack of authority to act should not permanently penalize a noncomplying corporation by impairing the validity of its actions.

¶ 51     Construing "maintain" to mean "commence" would run counter to this statutory intent. If section 113.70 were interpreted as preventing a noncomplying corporation from filing suit (or invalidating any suit filed by such a corporation), a foreign corporation that has not yet obtained authority to operate in Illinois would permanently be denied the ability to preserve a legal claim by filing suit and thereby tolling the statute of limitations. Under this interpretation, the penalty for noncompliance could include the loss of a potentially valid claim. This construction is inconsistent with the nature of the Act as coercive rather than punitive.

¶ 52     The purpose of the statute is better served by interpreting "maintain" as meaning "continue." Under this construction, although a noncomplying corporation may file suit and stop the running of the limitations period, once its lack of capacity is raised it may not prosecute that claim or obtain a judgment until it complies.

¶ 53     This has been the approach taken in cases involving for-profit corporations. For instance, in *Amman Food & Liquor, Inc. v. Heritage Insurance Co.*, 65 Ill. App. 3d 140, 147 (1978), the court construed the word "maintain" as used in a similar door-closing provision of the Corporation Act. There, the plaintiff corporation's premises were destroyed by fire, and the corporation sought payment under an insurance policy. *Id.* at 141. Approximately 10 months later, the corporation was administratively dissolved by the Secretary of State for failure to pay its taxes. *Id.* Shortly after that, the corporation filed suit against the insurer, which had refused to pay for the loss. The insurer filed an answer responding to the merits of the complaint. The one-year time limit for such suits under the policy expired approximately one month after the corporation had filed suit. *Id.* at 142.

¶ 54     Three months later, the corporation paid the taxes it owed and was reinstated. *Id.* Thereafter, the insurer moved to dismiss the suit on the ground that the corporation had lacked capacity to "maintain" the suit at the time it was filed. The insurer pointed out that the corporation still lacked capacity when the limitations period expired, and it argued that the suit therefore was not timely filed. In response, the corporation argued that the statutory bar was not permanent, that it had cured its lack of capacity through reinstatement, and that the reinstatement should relate back to the date it filed suit. The trial court agreed with the insurer and dismissed the case, and the corporation appealed.

¶ 55     The appellate court reversed, holding that the word "maintain" in the closed-door provision of the Corporation Act must be construed in a manner harmonious with the other provisions of that statute, which among other things permit a dissolved corporation to file suit within a statutorily defined period. *Id.* at 147. Accordingly, the approach inherent in the Corporation Act as a whole suggested that a plaintiff corporation could file suit despite its incapacity, but could not continue to prosecute the action (without obtaining authority) once an incapacity defense was raised via a motion to dismiss. *Id.*

¶ 56     This construction of "maintain" would permit a corporation to cure its incapacity during the pendency of the action by bringing itself into compliance with the requirements of the statute. The *Amman* court considered whether adopting this approach would undermine the objective of the closed-door provision–to coerce compliance with the requirements of the Corporation Act, including the payment of taxes. The court determined that, to the contrary, this approach would advance that goal, because a noncomplying corporation that had filed suit would be motivated to comply in order to avoid the dismissal of its suit, once its lack of capacity was raised before the court. *Id.* at 148. If the corporation could not avoid dismissal through belated compliance, it would have no incentive to comply at all. And, as a later decision following *Amman* noted, any risk that a corporation would attempt to delay or escape compliance with the Corporation Act through gamesmanship or bad faith could be addressed by the trial court's power to impose sanctions in that situation. See *Henderson-Smith & Associates, Inc. v. Nahamani Family Service Center, Inc.*, 323 Ill. App. 3d 15, 26 (2001).

¶ 57     In adopting this construction of "maintain," the *Amman* court also considered "fundamental concepts of justice." *Amman*, 65 Ill. App. 3d at 149. Imposing a permanent disability upon a corporation that was not in compliance with the Corporation Act on the date it filed suit could utterly defeat a potentially meritorious claim and provide a windfall to "a

defendant who has no special claim to favor." *Id.* The court noted that such a punitive approach would not harmonize with the principles that underlie statutes of limitation:

"The purpose of a statute of limitation is to protect a potential defendant from a stale claim, one filed after the facts have been forgotten or rendered unavailable. [Citations.] Such statutes are not to be used as a technical device to avoid liability where a defendant has received timely notice of an impending complaint and has been in no way prejudiced by the passage of time [citations]." *Id.* at 149-50.

In *Amman*, the insurer had indeed received timely notice of the claim against it and had not been prejudiced by the plaintiff corporation's temporary lack of capacity. Thus, the reviewing court held that fundamental concepts of justice supported finding that the corporation had cured its lack of capacity by paying the taxes it owed and obtaining reinstatement. *Id.* at 150. Moreover, like any other amendment designed to cure a pleading defect, such a cure should relate back to the filing of the suit. *Id.* at 145. Accordingly, the reviewing court held that the suit was timely despite the plaintiff corporation's lack of capacity at the time of filing, and reversed the trial court's dismissal of the complaint.

¶ 58    The case before us is factually similar to *Amman* in several key respects. As in *Amman*, the plaintiff here lacked capacity pursuant to a statutory closed-door provision at the time it filed suit. That lack of capacity still existed at the time the operative limitations periods expired. However, the plaintiff subsequently complied with the statutory requirements and was no longer under a disability at the time the defendant moved to dismiss for lack of capacity.

¶ 59    The legal principles involved are likewise similar. Like the Corporation Act, the Not for Profit Act provides that a noncomplying corporation whose authority to conduct affairs has been revoked may seek reinstatement, and upon reinstatement that authority must be deemed to have continued without interruption. The object of both statutes is to encourage compliance with their requirements, and thus the nature of both statutes is coercive rather than punitive. Finally, the same fundamental concepts of justice are at stake: the concern that potentially valid claims not be lost on technical grounds and that defendants not receive undeserved windfalls where there is another method of achieving the statutory goal of protecting the public. For all of these reasons, we find that the holdings of *Amman*–that a statutory closed-door provision does not bar the filing of a suit by a noncomplying corporation, and that such a corporation may cure its lack of capacity through subsequent compliance–may properly be extended to this case, in which the plaintiff complied during the pendency of the First Action, well before the motion to dismiss based upon lack of capacity was filed.[3]

---

[3]We note that, in other states, courts have adopted the following procedure when a motion to dismiss for lack of capacity is filed: if a defendant successfully shows that the plaintiff should have registered but did not and therefore lacks capacity, the court should stay the case to allow the plaintiff to comply, and if the plaintiff fails or declines to comply, the court should dismiss the case. See *Hurst v. Buczek Enterprises, LLC*, 870 F. Supp. 2d 810, 818 (N.D. Cal. 2012) (quoting *United Medical Management Ltd. v. Gatto*, 57 Cal. Rptr. 2d 600, 604 (Cal. Ct. App. 1996)); *In re Mobilevision Medical Imaging Services, LLC*, 885 N.Y.S.2d 631, 631 (N.Y. App. Div. 2009)

¶ 60    The defendants argue that *Amman* is distinguishable from the case before us, because *Amman* involved a corporation that once had existed in good standing but was administratively dissolved for failure to pay its taxes. The defendants stress that, unlike in *Amman*, here the plaintiff had no record of past compliance. Moreover, although the saving provisions of the Corporation Act provide that, upon reinstatement of the corporation, the reacquired authority to transact business in Illinois extends back to the date of dissolution, here there was no date upon which the corporation lost its authority to act: the plaintiff *never* had the authority to conduct affairs in Illinois, and so there was no earlier date for the belatedly obtained authority to relate back to.

¶ 61    We find these to be minor distinctions that do not negate the reasoning of *Amman*. Although it is certainly possible that the administrative dissolution of a corporation for failure to pay taxes will be a "temporary impediment" (as the defendants say), such dissolution may be permanent if the corporation is unable to pay those taxes. The defendants have not cited any authority suggesting that an administrative dissolution that results from the failure to pay taxes is qualitatively different from a lack of corporate authority that stems from a failure to obtain authority to conduct affairs, and we do not see any such difference. Similarly, we do not view the lack of an obvious "start date" to the lack of corporate authority as insuperable. If a noncomplying corporation is motivated to cure its lack of capacity during the pendency of a claim it seeks to prosecute, so as to be able to obtain a judgment in its favor on that claim, we see no reason why the date on which the corporation began conducting affairs (or the filing date of the lawsuit, if that is easier to ascertain) should not serve as the operative date for the corporation's subsequent authority to relate back to.

¶ 62    Nor do we view as significant the fact that the plaintiff here voluntarily dismissed its suit and then refiled it. Under section 13-217 of the Code, the refiled action is timely if filed within one year of the voluntarily dismissal, regardless of whether the limitations period on the claim has expired. 735 ILCS 5/13-217 (West 2010). We note that, in *Henderson-Smith*, 323 Ill. App. 3d at 26, the reviewing court held that a plaintiff corporation's postjudgment compliance with the requirements of the Corporation Act operated retroactively to validate the plaintiff's judgment in the prior suit. In that case, the plaintiff had been administratively dissolved by the Secretary of State for nonpayment of taxes. *Id.* at 17. While it was dissolved (and thus, under the closed-door provision, unable to maintain an action), it filed suit to recover payment under a contract. *Id.* at 18. The trial court denied the defendant's motion to dismiss that was premised on the plaintiff's lack of capacity, and eventually entered

---

(corporation whose petition was subject to dismissal because of its lack of capacity to sue under closed-door law would be granted "a reasonable opportunity to cure its noncompliance with the statute"). This procedure is consonant with the approach of Illinois courts in the few instances where the defendant has established the defense. See, *e.g.*, *Henderson-Smith*, 323 Ill. App. 3d at 23-24 (court should not dismiss outright but also should not enter judgment in favor of a plaintiff whose capacity has been challenged by way of a motion to dismiss; implying the use of a stay to permit compliance); see also 735 ILCS 5/2-619(a)(2) (West 2010) (case may be dismissed on the ground that "the plaintiff does not have legal capacity to sue" if the plaintiff refuses to comply even after the motion is brought).

judgment for the plaintiff on its claim. *Id.* However, when the plaintiff sought to enforce that judgment, the trial court quashed the citation to discover assets and sanctioned the plaintiff for issuing it. *Id.* The plaintiff then paid its taxes and was reinstated. The defendant moved to set aside the judgment and for a new trial, and the trial court denied the motion. *Id.* at 19. The defendant then appealed.

¶ 63     The reviewing court began by noting that, under the construction of "maintain" adopted in *Amman*, the trial court had erred in denying the motion to dismiss for lack of capacity, and in particular should not have entered judgment for the plaintiff before it complied with the Corporation Act so as to cure its disability. *Id.* at 24. However, once the plaintiff did comply with the statute, its disability was removed. *Id.* at 26. Accordingly, the trial court did not err in denying the defendant's postjudgment motion seeking a new trial. Noting that "[t]he statute is intended to be coercive rather than punitive," the reviewing court stated that "once a delinquent corporation does make good the deficiency, it should be allowed to carry on its business and conduct its legal affairs." *Id.* at 23. Such an approach reflected that "Illinois courts have understood the intent of the legislature to be that, so far as it is consistent with the protection of the State's interest, parties should not be able to employ these provisions to evade otherwise legitimate debts." *Id. Henderson-Smith*, in which the retroactive effect of compliance was applied postjudgment, represents a more extreme application of the statute than in the case before us, in which the plaintiff complied with the registration requirement during the pendency of the First Action. Accordingly, we see no reason why section 13-217 may not be applied here.

¶ 64     We close by noting that, in its briefs, the plaintiff raised constitutional challenges to section 113.70 of the Not for Profit Act based on the commerce clause and the first amendment to the United States Constitution. As the plaintiff conceded at oral argument, however, we need not address these arguments, as the case can be decided on other grounds. See *Innovative Modular Solutions v. Hazel Crest School District 152.5*, 2012 IL 112052, ¶ 38.

¶ 65                              IV. CONCLUSION

¶ 66     For all of the foregoing reasons, we reverse the judgment of the circuit court of Du Page County dismissing counts I, II, and III of the plaintiff's complaint, and we remand for further proceedings.

¶ 67     Reversed and remanded.